**FILED**

March 20, 2021

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _Breanna Coldewey_
DEPUTY

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| CATHERINE H. McMAHAN, as | § | |
| Conservator of LAWRENCE G. "LARRY" | § | |
| HANCOCK; H. SYCAMORE CREEK | § | |
| RANCH L.P.; and H. SYCAMORE CREEK | § | |
| RANCH MANAGEMENT GP, LLC, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL NO. 5:21-CV-00219-FB |
| | § | |
| JOHN W. PETRY; ROBERT B. | § | |
| WERNER; J. PATRICK ROUSE; | § | |
| STEVEN R BROOK; and | § | |
| LANGLEY & BANACK, INC;. and | § | |
| JOHN DOES 1-10 | § | |
| | § | |
| Defendants, | § | |

## FIRST AMENDED COMPLAINT

Plaintiffs, Catherine H. McMahan, as Conservator of Lawrence G. Hancock (hereinafter sometimes "Larry"), H. Sycamore Creek Ranch L.P., and H. Sycamore Creek Ranch Management GP, LLC (hereinafter collectively "Plaintiffs") bring this action for damages against Defendants, John W. Petry (hereinafter sometimes "Petry"), Robert B. Werner (hereinafter "Werner"), J. Patrick Rouse (hereinafter sometimes "Rouse"), Steven R. Brook (hereinafter sometimes "Brook"), Langley & Banack, Inc. (hereinafter sometimes "LB") and John Does 1-10 (collectively sometimes referred to as "Defendants"), for legal malpractice and negligence, breach of fiduciary duty, conspiracy to breach fiduciary duty, injunctive and declaratory relief, punitive damages, and gross negligence. Plaintiffs allege as follows:

## PARTIES

1.      Plaintiff Catherine H. McMahan is an adult resident citizen of Lee County, Mississippi, and is the duly appointed conservator of Lawrence G. Hancock by order of the Lee County, Mississippi, Chancery Court.

2.      Plaintiffs H. Sycamore Creek Ranch L.P. and H. Sycamore Creek Ranch Management GP, LLC (sometimes collectively "Sycamore") are Texas entities formed by the Defendants herein. While Lawrence ("Larry") G. Hancock, the ward of the subject conservatorship, is the real party in interest and at all relevant times the sole owner of Sycamore, in an abundance of caution the Sycamore entities are joined as co-plaintiffs herein.

3.      Defendant Petry is an adult resident citizen of Texas and is a practicing attorney with Langley & Banack, Inc.  Petry may be served with process at 105 North 4th Street, Petry Building, Carrizo Springs, Dimmit County, Texas 78834.

4.      Defendant Werner is an adult resident citizen of Texas and is a practicing attorney with Langley & Banack, Inc.  Werner may be served with process at 745 E. Mulberry Avenue, Trinity Plaza II, Suite 700, San Antonio, Texas 78212.

5.      Defendant Rouse is an adult resident citizen of Texas and is a practicing attorney with Langley & Banack, Inc.  Rouse may be served with process at 745 E. Mulberry Avenue, Trinity Plaza II, Suite 700, San Antonio, Texas 78212.

6.      Defendant Brook is an adult resident citizen of Texas and is a practicing attorney with Langley & Banack, Inc.  Brook may be served with process at 745 E. Mulberry Avenue, Trinity Plaza II, Suite 700, San Antonio, Texas 78212.

7.      Defendant Langley & Banack, Inc. (hereafter sometimes "LB"), is a law firm with multiple offices in Texas and is a corporation organized and existing under the laws of the State

of Texas.  LB may be served with process by and through its registered agent, Steven R. Brook, Trinity Plaza II, 745 E. Mulberry, 9th Floor, San Antonio, Texas 78212.

8.      Defendants John Does 1 through 10, are individuals, corporations, limited liability companies, partnerships or other entities who are joint actors or co-conspirators of the misconduct alleged in this Complaint, whose identity is unknown at this time.  The John Doe Defendants' acts or omissions either contributed to or directly caused the damages complained of herein. The identities of these Defendants are unknown to the Plaintiffs at this time and will likely be determined through adequate discovery in this matter.

## NATURE OF CASE

9.      This is an action, *inter alia*, for legal malpractice and professional negligence, gross negligence, breach of fiduciary duties, and conspiracy to breach fiduciary duties. Plaintiffs seek against Defendants Petry, Werner, Rouse, Brook, LB and John Does 1-10, jointly and severally, declaratory relief, compensatory damages, punitive damages, disgorgement of attorney fees, and restitution.

10.     Defendants Petry, Werner, Rouse, and Brook are, or were, attorneys, employees and agents of their law firm, defendant LB, and at all relevant times were acting within the course and scope of their employment and agency. LB is vicariously liable for the tortious conduct of all Defendants.

11.     Defendants represented Larry and Plaintiffs in connection with real estate transactions and other matters over a period of several years, from and before 2001.  In the course and scope of that representation, Defendants were guilty of professional negligence, breaches of fiduciary duties, and civil conspiracy to breach fiduciary duties owed to Larry and Plaintiffs. Such tortious conduct proximately caused significant damage to Larry and Plaintiffs.

## JURISDICTION AND VENUE

12.     Jurisdiction is proper because the amount in controversy is within the jurisdiction limits of this Court.  *See* Tex. Cont. art. V, § 8; Tex. Gov't Code §§ 24.007 & 24.008.  Pursuant to Rule 47 of the Texas Rules of Civil Procedure, Plaintiffs seek monetary relief over One Million Dollars ($1,000,000.00).

13.      The Court has personal jurisdiction over Defendants and subject matter jurisdiction over the facts of this action.  Defendants Petry, Werner, Rouse and Brook are resident citizens of Texas and LB is a corporation organized and existing under the laws of the State of Texas with its principal place of business in San Antonio, Bexar County, Texas.

## FACTS

14.     In or around 2006, Larry hired Petry and LB to be his legal representatives before Larry purchased the property known as the "Weston Ranch" in Val Verde and Kinney Counties, Texas, consisting of 12,572.26 acres.  From the outset of the representation, Petry expressed a desire to own the ranch in some fashion because of its valuable water rights.

15.     Larry's mother, Elaine Hancock, gave him funds to purchase the Weston Ranch for approximately Twelve Million Five Hundred Thousand Dollars ($12,500,000.00).

16.     Subsequent to the original purchase, Defendants formed a Texas limited liability company, H. Sycamore Creek Ranch, LP., for Larry and Sycamore to hold title to the ranch. Its only two members are Larry and H. Sycamore Creek Ranch Management Group, LLC, of which Larry is the only member.  (For ease of reading, these entities are sometimes referred to as "Sycamore" or "H. Sycamore".)

17.     On February 7, 2012, Larry and other Plaintiffs executed a note in the original amount of Seven Million One Hundred Four Thousand Seventy-Six Dollars and Ninety-Six Cents

($7,104,076.96) in favor of L. D. Hancock Company, LLC, a copy of which is attached hereto as Exhibit "A" and incorporated herein by reference; and sold 37.75% of H. Sycamore Creek Ranch, LLC to L. D. Hancock Company, LLC.

18.     In 2012-2013 Defendants set up three LLCs (EC) for the purpose of purchasing the surface, water and minerals of Larry's ranch.  Defendants clearly had conflicts of interest as they/it represented all sides to the transactions, i.e., Plaintiffs, EC, LD Hancock Co. LLC, Petry and his friend Brady Kimble ("Kimble"). Defendants' billing records show that Defendants represented all sides of the ranch purchase transactions - Sellers, Buyers, and Lender.) Illustrative of these conflicts is the representations in the 2013 Weston Ranch Agreement (Exhibit "C", section 4.17) acknowledging that LB's Rouse and Werner represented Petry, Larry, and Brady Kimble (all individually) in connection with multiple Weston Ranch transactions including the February 15, 2013 Farm and Ranch Contract (Exhibit "D" attached hereto); at the same time that LB's Rouse was representing the buyer Estate Commodity (of which Petry owned 9.9%) and LB's Petry was representing the seller H Sycamore (of which Larry owned 100%). (See Farm and Ranch Contract, Exhibit "D", ¶24.) Throughout these conflicting representations, LB inexplicably charged clients Larry and Plaintiffs excessive and disproportionate fees while "undercharging" their other clients including Petry and Kimble.[1]

19.     Ranch Water and Minerals agreed to purchase the ranch from Larry and other Plaintiffs on February 28, 2013. L. D. Hancock Company, LLC executed a Release of Lien, which was recorded in Kinney and Val Verde Counties, Texas, a copy of which is attached hereto as Exhibit "E" and incorporated herein by reference.  The Release of Lien specifically stated in part:

---

[1] The Farm and Ranch Contract, as well, obligated H Sycamore (represented by LB's Petry and owned 100% by Larry who was represented individually by LB's Rouse and Warner) to pay to Petry (also represented by LB's Rouse and Werner) a "Broker's Fee" of 1%; and to pay Kimble (also represented by LB's Rouse and Werner) a "Broker's Fee" of 2%; and to pay Bill Mueller a "Broker's Fee" of 1%. (**Exhibit** "D", ¶8.)

Holder of the Note and Liens acknowledges payment in full of the Note and releases the Property from the Liens and from all liens held by Holder of the Note and Liens, without regard to how they were created or evidenced.

The above language is consistent with the language in the Farm and Ranch Contract which provided, "Seller represents that as of the Closing Date there will be no liens, assessments or security interests against the Property which will not be satisfied out of the sales proceeds." (Exhibit "D", ¶19.) The Release of Lien was duly recorded and on February 18, 2013, there was no lien whatsoever on the Weston Ranch property. On or around February 20, 2013 the 37.75% of the ranch owned by L.D. Hancock Company, LLC (sometimes referred to as "L.D. Hancock"), was transferred back to Larry and other Plaintiffs so that he and his LLC, H. Sycamore, owned the entire ranch debt free.

20.     Throughout their representation, Defendants continued to unduly influence and befriend Larry. Defendants influenced Larry to such a degree that they convinced him to sell his ranch to Ranch Water and Minerals for Twenty-Two Million Five Hundred Thirty-Eight Thousand Dollars ($22,538,000.00), with owner financing, no down payment, below market interest, and no payment due to be paid to Larry and other Plaintiffs until four years after closing, another at eight years after closing, and the full purchase price not being due for fifteen years.

21.     Defendants drafted the Weston Ranch Agreement outlining the terms of the purchase and sale of the Weston Ranch from Larry and other Plaintiffs to Ranch Water and Minerals.

22.     Defendants formed Texas limited liability companies, Estate Commodity Water, LP, Estate Commodity Minerals, LP and Estate Commodity Ranch, LP (sometimes referred to as "Ranch," "Water" and "Minerals") to hold title to the surface, water and minerals, respectively, of the Weston Ranch.

23.    Though Defendants' representation of all of the parties to the 2013 Weston Ranch transactions constituted unavoidable conflicts and though they committed professional negligence and breached fiduciary duties owed to Larry and Plaintiffs, the 2013 Weston Ranch Agreement clearly provided that the Ward, Larry, and other Plaintiffs owed no money on the ranch; and, in fact, the obligation to pay the prior indebtedness to L. D. Hancock Company, LLC (which at the time consisted of his mother, Elaine Hancock) was solely that of the EC. The following specific language of the Weston Ranch Agreement clearly removes any obligation for Larry and other Plaintiffs to pay any debt on the property:

> On or about February 20, 2013 Larry acquired L.D. Hancock's 37.75% limited partnership interest in H Sycamore, **payment for which will be satisfied from amounts owing by Makers [EC] on the Obligation, below defined**;

> \* \* \*

> 1.02    Consideration. As payment for the Property, Ranch, Water, and Minerals have executed, or will execute, jointly and severally, that certain Real Estate Lien Note of even date herewith made payable to the order of H Sycamore in the original principal amount of $22,538,000.00 (the "Obligation"). The Obligation shall be secured by the vendor's liens retained in the respective vesting deeds to each of Ranch, Water, and Minerals, and by three (3) deeds of trust executed by each of Ranch, Water, and Minerals recorded, or to be recorded, in the real property records of Val Verde and Kinney Counties, Texas. Payments made by Makers in satisfaction of the Obligation shall be allocated as follows:

> 1.02.1    $8,065,704.32 of the Obligation shall be allocated to H Sycamore.

> 1.02.2    $7,076,372.64 of the Obligation shall be allocated to L.D. Hancock in order to satisfy an existing lien on the Property held by L.D. Hancock.

> 1.02.3    $7,395,923.04 of the Obligation shall be allocated to L.D. Hancock as a result of Larry's acquisition of L.D. Hancock's ownership interest in and to H Sycamore.

Weston Ranch Agreement, pp. 1-2 (emphasis added)

24.     On February 28, 2013, upon the advice and direction of Defendants, Larry and the other Plaintiffs executed the Weston Ranch Agreement outlining the terms of the purchase and sale.  Defendants drafted the document. Defendant Rouse was included in the agreement as the person to receive copies of any notices directed to Larry, Petry and his friend Kimble, and EC. Notices directed to other Plaintiffs (i.e., H Sycamore) should copy "Langley & Banack, Inc."

25.     At Defendants' insistence, on or about February 20, 2013, Larry and other Plaintiffs acquired L. D. Hancock Company, LLC's 37.75% interest in H. Sycamore before closing on the sale to EC on February 28, 2013.

26.     Under the Weston Ranch Agreement, EC (the "Petry Group" – sometimes referred to therein as "Makers"), were obligated to pay the purchase price to L. D. Hancock Company, LLC for its 37.75% interest, but failed to do so.  This failure was due to the negligence and breaches of fiduciary duty of Defendants.

27.     The Weston Ranch Agreement was one-sided and included provisions for substantial fees to be paid to Defendants and is a prohibited transaction under the Texas Disciplinary Rules of Professional Conduct ("TDRPC"), and specifically, Rules 1.06 and 1.08.

28.     TDRPC 1.06 provides in part:

**Rule 1.06. Conflict of Interest: General Rule**

...
  (b) ln other situations and except to the extent permitted by paragraph (c), a lawyer shall not represent a person if the representation of that person:

    (1) involves a substantially related matter in which that person's interests are materially and directly adverse to the interests of another client of the lawyer or the lawyer's firm; or

    (2) reasonably appears to be or become adversely limited by the lawyer's or law firm's responsibilities to another client or to a third person or by

the lawyer's or law firm's own interest;

(c) A lawyer may represent a client in the circumstances described in (b) if:

(1) the lawyer reasonably believes the representation of each client will not be materially affected; and

(2) each affected or potentially affected client consents to such representation after full disclosure of the existence, nature, implications, and possible adverse consequences of the common representation and the advantages involved, if any.

(TDRPC 1.06). Defendants' conduct and representation of Larry and other Plaintiffs throughout the subject Weston Ranch transactions, including the October 2016 transactions discussed below, were in violation of Rule 1.06. This rule, while not creating a separate or independent cause of action, helps frame the standard of care expected of attorneys in situations as existed with the Weston Ranch transactions. To satisfy the standard of care owed to Larry and Plaintiffs, Defendants had the duty to disclose and explain the existence, nature, implications, and adverse consequences of the transactions of the common and conflicting representations, including those of Petry and Brady Kimble; and that Larry and Plaintiffs consented to such representation after full disclosure. Defendants clearly breached these duties, causing millions of dollars of damages to Larry and Plaintiffs.

29.     TDRPC provides as follows:

**Rule 1.08. Conflict of Interest: Prohibited Transactions**

(a)     A lawyer shall not enter into a business transaction with a client unless:

(1)     the transaction and terms on which the lawyer acquires the interest are **<u>fair and reasonable to the client</u>** and are fully disclosed in a manner which can be reasonably understood by the client;

(2)     the client is given a reasonable opportunity to seek
the advice of independent counsel in the transaction;
and

(3)     the client consents in writing thereto.

(TDRPC 1.08) (emphasis added). Defendants' conduct and representation of Larry and other Plaintiffs throughout the subject Weston Ranch transactions, including the October 2016 transactions discussed below, were in violation of Rule 1.08. This rule, while not creating a separate or independent cause of action, helps frame the standard of care expected of attorneys in situations as existed with the Weston Ranch transactions. The standard of care required that the terms of the Weston Ranch transactions be fair and reasonable to Larry and Plaintiffs. Further, the standard required that the interests of Petry, Brady Kimble, and others represented by Defendants be fully disclosed in a manner that could reasonably be understood by Larry and Plaintiffs; and that Larry and Plaintiffs be allowed a reasonable opportunity to seek advice from independent counsel; and that Larry and Plaintiffs, after being fully informed, consent to the representation in writing. Defendants clearly breached these duties, causing millions of dollars of damages to Larry and Plaintiffs.

30.     The terms of the Weston Ranch Agreement were unconscionable and provided that EC would purchase the ranch with no money down, a below market interest rate, installments only to be made many years after the sale, no guarantee of actual purchase price, and no recourse against Petry and his friends.  In addition to the hourly billing fees and retainers already paid by Larry and other Plaintiffs, it further provided for Defendants to be paid substantial fees arising out of the "sale" of the property, as follows:

1.04.1 Notwithstanding the allocation of payments on the Obligation as provided in Section 1.02, above, the Parties agree that payments made by

Makers towards satisfaction of the Obligation shall be distributed as follows:

1.04.1.1.1     $225,380.00 to John Petry, c/o Langley & Barrack, Inc., 745 E. Mulberry, Suite 900, San Antonio, Texas 78212 (the "Petry Fee").

1.04.1.1.2     $225,380.00 to Bill Mueller, 4107 Emmett Drive, Montgomery, Texas 77316 (the "Mueller Fee").

1.04.1.1.3     $450,760.00 to Brady, 6 River Crossing, Boerne, Texas 78006 (the "Brady Fee").

31.     The Weston Ranch Agreement further included a Special Durable Power of Attorney for Financial Transactions from Larry and other Plaintiffs granting LB, to the attention of Rouse, the authority to receive, endorse, negotiate and disburse all payments made on the Obligation (owed by EC).   The Defendants also paid themselves directly from proceeds of ranch transactions without disclosing same to Larry and other Plaintiffs; and Defendants also required Larry's and other Plaintiffs' bank account statements be sent to and kept exclusively by the Defendants' law firm, thus actively concealing their professional negligence and resulting damages.

32.     The purchase of the Weston Ranch by EC and the terms of the Weston Ranch Agreement were unconscionable, a conflict of interest, and amount to a breach of fiduciary duty by Petry, Rouse, Werner, Brook and their firm, LB.  At all relevant times, Petry, Rouse, Werner, and Brook were acting within the course and scope of their employment and as agents of LB.

33.     Rouse, Werner, and Brook, along with LB, aided and abetted in the breach of fiduciary duty by Petry, through their actions in connection with the consummation of the sale and purchase of the Weston Ranch by EC and other actions and inactions.

34.     Defendants collected attorney fees of hundreds of thousands of dollars under the Weston Ranch Agreement for the "sale" to EC, to the detriment of their clients, Larry and other

Plaintiffs. Moreover, during the ownership term of the ranch by EC, two natural gas pipeline easements were deeded by EC which netted sales proceeds of over Two Million Dollars ($2,000,000.00), much of which was deposited with Defendants, in trust, and distributed for fees and other unknown expenses and negligently paid to Defendants without disclosure to Larry and Plaintiffs and without their permission.[2]

35.     At the direction of Defendants, EC planned to market the ranch and attempt to sell it at a huge profit without making any payments on the note to Larry and other Plaintiffs, all before they were required to close the transaction with Larry and other Plaintiffs.

36.     The 2016 Amended and Restated Weston Ranch Agreement extended the time for Ranch Water and Minerals to make the initial payment on the ranch property from February 28, 2017 to June 30, 2018.  Throughout this time, Defendants continued to unduly influence Larry and provide false information to him regarding the value of the ranch and potential opportunities to sell the ranch and water rights, so that Larry and other Plaintiffs would not foreclose on the property.

37.     In 2015, Larry began to fall frequently and have symptoms of dementia and was finally diagnosed with Lewy Body Dementia, a disease which causes dementia, physical incapacity, and other manifestations.  The disease robbed Larry of his mental faculties and comprehension, and Defendants were fully aware of his condition.

38.     On October 15, 2015, Larry's mother died and her will and trusts awarded him twenty-five percent (25%) of her estate. This 25% share was valued at approximately Seven Million Five Hundred Thousand Dollars ($7,500,000.00).

---

[2] These easements and expected revenues were anticipated by Petry and Defendants before EC contracted to buy the ranch from Larry and Plaintiffs.

39.     Defendants, on behalf of their other client, EC kept the ranch off the market for a period of approximately five years and represented to Larry and other Plaintiffs that it was worth One Hundred Million Dollars ($100,000,000.00). Defendants advised its other clients (EC), in direct conflict with the interests of Larry and other Plaintiffs, to purchase the ranch from their client (Larry and other Plaintiffs) for no out-of-pocket money, sell the ranch for up to this One Hundred Million Dollar ($100,000,000.00) valuation, and pocket the profit to the detriment of their clients, Larry and other Plaintiffs.  (See letter to Michael D. Greer, 9/21/2018, attached hereto as Exhibit "F" and incorporated herein by reference.)

40.     Defendants at all times were supposed to have been representing and advising Larry and other Plaintiffs. They had ethical, professional, and fiduciary duties not to take unfair advantage of their clients Larry and Plaintiffs.  Defendants breached those duties when they advised EC to buy the ranch from Larry in an unethical fashion, charged unconscionable fees for the "sale", and kept the ranch off the market for six years with the full intention to flip the ranch for a substantial profit to the benefit of their other clients Ranch Water and Minerals, Petry and Kimble.  Upon advice of Defendants, EC was to sell the ranch for Defendants' estimated value; pay Larry for their purchase of the ranch if they were able to find a buyer; or, if not able to find a buyer, refuse to pay Larry for the purchase of the ranch and at the last-minute deed it back to him in lieu of foreclosure; which is exactly what happened.

41.     In the spring of 2016, Defendants began to realize that EC would be defaulting on the real estate contract for Twenty-Two Million Five Hundred Thirty-Eight Thousand Dollars ($22,538,000.00) and that other family members might become involved in Larry's affairs given his mental decline.  Defendants, therefore, began communicating with the attorneys for the estate of Larry's mother and siblings. (See correspondence between and among LB's Petry, Rouse and

Werner; and L.D. Hancock and estate representative Haygood and their attorneys Phelps Dunbar, dated March 25, 2016 and April 27, 2013, attached hereto as cumulative Exhibit "G" and incorporated herein by reference.) Although the 2013 Weston Ranch Agreement absolved Larry and his limited liability company, H. Sycamore, from any debt or obligation, Defendants  made an offer to the law firm representing the estate, the other siblings and L. D. Hancock Company, LLC, to give up Larry's inheritance (which was at the time valued at about Seven Million Five Hundred Thousand Dollars ($7,500,000.00)) in order to pay debt which, under the Weston Ranch Agreement, was not obligated to be paid by Larry and other Plaintiffs but was obligated to be paid by Ranch Water and Minerals. Additionally, Defendants offered to have Larry and other Plaintiffs sign a new note and deed of trust to be placed on his ranch; which, at that time, was encumbered only by the $22,538,000 debt owed by EC to Larry and Plaintiffs.

42.     Based on Defendants' negotiations, a Settlement, Transfer and Release Agreement[3] was consummated by Larry, his siblings and L. D. Hancock Company, LLC.  As a result of Defendants' offer and influence on Larry and other Plaintiffs, on October 7, 2016, Larry and other Plaintiffs basically owed approximately Fifteen Million Dollars ($15,000,000.00) in debt that they did not owe on October 6, 2016.  On this date, October 7, 2016, Larry was suffering with Lewy Body Dementia and did not have his mental faculties. Nonetheless, Defendants advised Larry to enter into this agreement and the Amended Weston Ranch Agreement, which in combination cost Larry Fifteen Million Dollars ($15,000,000.00) in debt that he did not owe the minute before he signed and wiped out his expected inheritance.  Any lawyer who would advise his client, especially when mentally incompetent, to sign a document obligating his client to owe approximately Fifteen

---

[3] The Settlement, Transfer and Release Agreement contains a confidentiality provision.  Accordingly, it is only discussed generally here and will be submitted under seal, if permitted by the Court.

Million Dollars ($15,000,000.00) that he did not owe amounts to the worst example of legal negligence, and breach of fiduciary duty, imaginable.  All of this advice by Defendants to Larry and Plaintiffs was for the sole purpose and benefit of exonerating the other client, EC from a ranch purchase that they could not or would not close.

43.    Defendants had Larry and other Plaintiffs sign these documents to bail EC out of the obligation to close on the ranch and pay the Twenty-Two Million Five Hundred Thirty-Eight Thousand Dollars ($22,538,000.00), which had been the agreed upon purchase price since 2013.

44.    Defendants, as employees and agents of LB, were committing professional negligence and breaches of fiduciary duties by undertaking the representation of multiple parties with obvious conflicts of interest. These actions injured their clients Larry and Plaintiffs to the tune of approximately Fifteen Million Dollars ($15,000,000.00). Petry and Defendants negligently advised Larry and Plaintiffs to enter into this "deal", thereby giving away his inheritance and assuming a debt that placed a lien on the Weston Ranch for approximately Seven Million Two Hundred Thousand Dollars ($7,200,000.00), i.e., a debt that was not owed by Larry and other Plaintiffs before October 7, 2016, but instead was owed by LB's other clients EC.

45.    Rouse and Werner, as associates of Petry and employees and agents of LB, participated in these negotiations with adverse counsel and the consummation of the October 7, 2016 transactions.  These actions by Petry, Rouse, Werner and LB amount to professional malpractice, negligence, gross negligence, breach of fiduciary duty, conflicts of interest and aiding and abetting a breach of fiduciary duty, whereby Petry (and Rouse, Werner and LB) placed their own interest over and above their clients' in violation of Texas law.  At all relevant times, Defendants' loyalties unbeknownst to Larry and Plaintiffs were to LB's other clients including Petry and Kimble; all to the detriment of Larry and Plaintiffs.

46.    Further, attorney Brook (as Managing Director of LB) in 2013 and again in 2018 undertook on behalf of LB's clients Larry and Plaintiffs to assess the conflicts of interest overshadowing the 2013 and 2018 Weston Ranch transactions, including the July 20, 2018 Deed in Lieu of Foreclosure attached hereto as Exhibit "H". As a part of this undertaking and representation, Brook and LB owed fiduciary duties and professional duties of reasonable care to Larry and Plaintiffs to make the proper disclosures and recommendations to Larry and Plaintiffs relative to conflicts and self-dealing; and to make reasonable decisions relative to LB's continued representation of Larry, Plaintiffs and LB's other clients relative to these transactions; and/or to otherwise take reasonable actions to protect Larry and Plaintiffs from the conflicts and self-dealing Brook and LB breached these duties miserably. They either failed to undertake a reasonable investigation of the conflicts and nature of the transactions; and/or they failed to act as reasonably prudent legal professionals to fully and properly inform and advise Larry and Plaintiffs; and/or failed to withdraw from representing the parties to these transactions while strongly advising Larry and Plaintiffs to secure independent legal representation; and/or otherwise failed to take reasonable actions to protect Larry and Plaintiffs from the conflicts and self-dealing. Brook and LB breached these duties miserably. These breaches proximately caused significant damage to Larry and Plaintiffs.

47.    Absolutely no conflict assessment was undertaken by LB relative to the 2016 transactions. Certainly, in violation of TDRPC Rules 1.06 and 1.08, no written waiver of conflicts was obtained.  On information and belief, Brook as Managing Director of LB had the responsibility to investigate and assess potential conflicts on behalf of LB and its attorneys. Brook either knew or should have known of the 2016 transactions. His failure to adequately investigate and assess the conflicts, failure to fully and adequately inform Larry and Plaintiffs of the nature, extent and

implication of the conflicts, and failure to take reasonable actions to protect Larry and Plaintiffs from the conflicts and self-dealing and breaches by Petry and Defendants, were breaches in the standard of care owed to Larry and Plaintiffs. These breaches proximately caused significant damage to Larry and Plaintiffs.

48.    At all relevant times, LB owed duties and standards of care to Larry and Plaintiffs to adopt and employ reasonable policies and procedures for identifying, assessing and avoiding conflicts of interest and self-dealing by its attorneys relative to business transactions entered into with its clients. LB breached these duties and standards of care. These breaches proximately caused significant damage to Larry and Plaintiffs.

49.    Because of Larry's mental state with Lewy Body Dementia, which existed at the time these agreements were signed on October 7, 2016 and July 2018, the legal malpractice was not discovered until the appropriate documents were forwarded by Petry and other members of his firm to the attorneys for the conservator, who was first appointed on August 9, 2018. The documents have been provided piecemeal and all documents requested, which are necessary to complete the range of documents and action by Defendants, have yet to be produced.  Counsel for Plaintiffs has requested on multiple occasions the transactional documents for EC and the documents prepared on behalf of H. Sycamore LP and H. Sycamore Group, LLC. Many of these documents have not yet been received or were only recently received.  The Texas two-year statute for legal malpractice is tolled by Defendants' own actions while continuing to represent Larry and while refusing to produce documents necessary to pursue these claims. It is likewise tolled by the mental incapacity of Larry, the Ward, relative to the 2016 and post-2016 transactions.

50.    Defendants, as agents and within the course and scope of their employment with LB,  all acted against the best interest of their clients, Larry Hancock and Plaintiffs, unduly

influenced them and violated ethical considerations and disciplinary rules of Texas professional conduct in taking advantage of Larry and other Plaintiffs in a business transaction whereby they put their other clients' interests above those of their clients Larry and other Plaintiffs  and caused them at least Twelve Million Dollars ($12,480,192.00) in damages when his conservator was forced to short sell his property on the eve of foreclosure.

51.     Defendants are further guilty of professional legal malpractice, negligence, gross negligence, breach of fiduciary duty, and aiding and abetting in breach of fiduciary duty, when they offered to give away Larry's inheritance and helped draft a document which they required Larry and other Plaintiffs to sign when he was mentally incapable of comprehending it, which cost him approximately Fifteen Million Dollars ($15,000,000.00).

52.     On October 7, 2016, Defendants influenced Larry and other Plaintiffs to execute multiple documents, all to their detriment, which included the Amended and Restated Weston Ranch Agreement, attached hereto as Exhibit "I" and incorporated by reference, Amended and Restated Real Estate Lien Note, attached hereto as Exhibit "J" and incorporated herein by reference, Subordination Agreement, attached hereto as Exhibit "K" and incorporated herein by reference, and six new Deeds of Trust, attached hereto as Exhibits "L-1 – L-6" and incorporated by reference.

53.     The Amended and Restated Weston Ranch Agreement was similar to the original Weston Ranch Agreement, but included significant modifications, all of which were to the detriment of Larry and other Plaintiffs and to the advantage of Defendants' other clients, Ranch Water and Minerals, Petry and Kimble.

54.     Defendants conspired with adverse counsel to Larry's and other Plaintiffs' detriment for their other clients' gain in negotiating, drafting and requesting Larry to sign the 2016

documents, all while he was suffering from Lewy Body Dementia.  Defendants were aware that Larry was having cognitive problems and instead of upholding their duty to protect him, as their client, they took advantage of him and his illness to relieve their other client, EC, from the obligations under the 2013 purchase.

55.     From February 28, 2013 through October 6, 2016, L.D. Hancock had no lien on the Weston Ranch property and the only debt owed to L. D. Hancock was obligated to be paid by EC. The October 7, 2016 Amended and Restated Weston Ranch Agreement, however, included an agreement to reinstate the Sycamore note, which had previously been released and filed of record, and also added interest for the three-year period from 2013 through 2016.  In other words, in 2013 EC was the "borrower" and Sycamore was the "lender." But, the 2016 transaction made Sycamore the "borrower", EC the "grantor" and LD Hancock the "lender." No reasonable, competent person would have signed the unconscionable agreement, but Larry, being of unsound mind, relied on the counsel of Petry, LB, Werner and Rouse, as his attorneys, to his detriment when they advised him to sign same.  The 2016 Amended and Restated Weston Ranch Agreement included the additional following language, which was not a part of the 2013 Weston Ranch Agreement:

> 1.01  Sale of Property.   . . .  In connection with the conveyance of the Property to EC and the execution of the Original Agreement, L D. Hancock filed a Release of Lien (Book 203, Page 118, Official Public Records of Kinney County, Texas, and Document Number 00275970, Official Public Records of Val Verde County, Texas) (the "Release") relating to that certain Real Estate Lien Note dated February 7, 2012 in the original  principal amount  of $7,104,076.96  which encumbered  the Property (such Real Estate Lien Note, as modified, amended, and/or restated from time to time, is referenced herein  as  the  "Family  Obligation").  By filing the Release L.D. Hancock enabled H Sycamore to secure a first priority lien as to the Property upon the filing of the Vendors' Liens and the Deeds of Trust. Despite language in the release to the contrary, the Family Obligation has not been satisfied and remains outstanding. The balance owed pursuant to the Family Obligation as of October 7, 2016 is $8,001,250.37, and said obligation is evidenced by the A&R L.D. Hancock Note defined below). For the avoidance of confusion, the Parties acknowledge and agree that the

amounts owed pursuant to the Family Obligation, as evidenced by the A&R L.D. Hancock Note, shall continue to accrue interest from and after October I, 2016, in accordance with the terms of the A&R L.D. Hancock Note.

3.03    Additional Pledge of the Property to Secure Repayment of the Family Obligation.  In consideration of the covenants and agreements set forth herein, including, but not limited to, L.D. Hancock agreeing to extend the maturity date applicable to the repayment of the Family Obligation from February 7, 2017 to June 30, 2019, simultaneously with the execution of this Agreement:

  3.03.l Larry, in his capacity as Manager of General Partner and on behalf of H Sycamore, hereby covenants and agrees to execute the Amended and Restated Real Estate Lien Note, a true and correct copy of which is attached hereto as Exhibit F-l and incorporated herein by reference (the '°A&R L.D. Hancock Note"), and to deliver said instrument to L.D. Hancock contemporaneous with the execution of this Agreement. For the avoidance of confusion and notwithstanding anything herein to the contrary, the Parties acknowledge and agree that (i) any reference herein to payment and/or satisfaction of the Family Obligation shall mean full and final satisfaction of all amounts due and owing under the A&R L.D. Hancock Note, and (ii) the A&R L.D. Hancock Note amends and restates the Family Obligation and shall not be construed as a novation of the Family Obligation. To the extent that the principal balance of the A&R L.D. Hancock Note includes a portion of the indebtedness evidenced by the prior Real Estate Lien Note referenced in Section 1.01 above, the A&R L.D. Hancock Note (a) merely restates the indebtedness evidenced by the prior Real Estate Lien Note referenced in Section 1.01 above prior to the date hereof, and (b) is given as substitution for, and not as payment of, said prior note.

  3.03.2   EC each covenant and agree to execute the Deeds of Trust attached hereto as Exhibits F-2, F-3, and F-4, respectively, each being incorporated herein by reference (collectively, the "L.D. Hancock Deeds of Trust"), granting L.D. Hancock a first priority lien against the Property to secure payment of the Family Obligation and the Profits Interest Obligation. Makers shall deliver said
Instruments to L.D. Hancock contemporaneous with the execution of this Agreement for recording in the Official Public Records of Val Verde and Kinney Counties, Texas. Each of EC is an associate of H Sycamore, and hereby acknowledges and agrees that it is pledging its interest in and to the Property as collateral to secure H Sycamore's indebtedness owed to L.D. Hancock and that by doing so it has received the benefit of certain payment obligations that it has to L.D. Hancock being deferred resulting in a direct benefit to EC, as applicable.

3.03.3  H Sycamore consents to EC' further encumbrance of the Property to secure repayment of the Family Obligation. H Sycamore covenants and agrees to execute the Subordination Agreement attached hereto as Exhibit F-5 and incorporated herein by reference, to evidence the subordination of the Vendors' Liens and Deeds of Trust referenced in the Recitals above to the liens evidenced by the L.D. Hancock Deeds of Trust attached to Exhibits F-2, F-3 and F-4. For the avoidance of confusion, the Parties acknowledge and agree that H Sycamore's liens encumbering the Property shall at all times be and remain subordinate to L.D. Hancock's first priority lien against the Property. In the event H Sycamore forecloses its subordinate lien(s) against the Property, any and all cash proceeds (specifically excluding any credit bid) resulting from such foreclosure shall be paid directly to L.D. Hancock, without set-off or deduction, to satisfy the Family Obligation and the Profits Interest Obligation. In the event such proceeds are not sufficient to satisfy the then outstanding balance of the Family Obligation and the Profits Interest Obligation or in the event of a credit bid by H Sycamore, the Property shall remain encumbered by and subject to L.D. Hancock's first priority lien until such obligations are paid in full.

3.03.4   The Parties acknowledge and agree that in the event the Family Obligation and the Profits Interest Obligation are not satisfied in full on or before June 30, 2019, L.D. Hancock shall be entitled to foreclose its first priority lien against the Property pursuant to the terms of the L.D. Hancock Deeds of Trust and applicable Texas law.

56.     The lien was released in 2013 "in connection with the conveyance of the Property to EC". After Defendants realized EC were not going to sell the property for a huge profit before the 2017 obligation to make the Two Million Five Hundred Thousand Dollar ($2,500,000.00) first payment on their purchase they grabbed the opportunity to remove the obligation of EC and insert the language in the "amended" document so that the obligation, which had grown to more than Eight Million Dollars at that point, would be owed by their client, Larry and other Plaintiffs, and not their other client Ranch Water and Minerals.

57.     In the spring of 2018, Larry's health was rapidly declining, he was confused, disoriented and suffering from hallucinations.  He was admitted to a mental health ward in Baptist Memorial Hospital, Booneville, Mississippi, on April 2, 2018 for treatment.  After his release, he

stayed with his daughter for several weeks until July 2018 when Petry and LB (to try to effectuate the July 2018 Deed in Lieu of Foreclosure and related transactions) paid someone to secretly travel to Mississippi and physically take Larry to Texas without his doctor's or the family's knowledge or consent.  Throughout this time period, Petry was continuing to call Larry daily and unduly influence him. And, all the while, Rouse, Petry and Werner billed Larry (instead of their clients EC) approximately $10,000 to prepare the Deed in Lieu of Foreclosure. The billing was not the obligation of Larry. It was unconscionable. And it was unilaterally and without Larry's knowledge or consent taken by LB from monies belonging to Larry (held in LB's trust account) to pay for the fraudulent $10,000 invoice.

58.     Although Defendants were aware of Larry's health and cognitive issues and Lewy Body Dementia diagnosis, when they realized Ranch Water and Minerals would not be able to meet the initial obligations of payment, when Larry returned to Texas for a brief time, they had Larry and other Plaintiffs "allegedly" execute the Agreement to Accept Deed in Lieu of Foreclosure on July 20, 2018, attached hereto as Exhibit "M" and incorporated herein by reference. Defendants drafted the agreement as attorneys for their mentally incompetent client. They reserved the right for their other clients (Petry and friends) to obtain large brokerage fees while reserving a first right of refusal so that Petry and friends could retain as much as one-half of the water rights.

59.     Defendants drafted and had Larry and other Plaintiffs "allegedly" accepted deeds in lieu of foreclosure for the ranch property from EC, on July 20, 2018, copies of which are attached hereto as cumulative Exhibit "N" and incorporated by reference.

60.     On August 9, 2018, Larry's daughter, Catherine H. McMahan, was appointed temporary conservator of Larry by the Lee County, Mississippi, Chancery Court, and was appointed permanent conservator on December 13, 2019.  The orders appointing the temporary

and permanent conservator are attached hereto as Exhibits "O" and "P" and are incorporated herein by reference.   Letters of Conservatorship are attached hereto as Exhibits "Q" and "R" and incorporated herein by reference.

61.     Because Defendants' other client, EC did not meet the obligations of the Weston Ranch Agreement and deeded the property back to Larry and other Plaintiffs in lieu of foreclosure, there was a short period of time for Larry's conservator to market the ranch before it would be subject to foreclosure (due to the lien held by L.D. Hancock that previously had been released but was reinstated due to Defendants' actions).  Because of the short period of time for marketing and because Larry was mentally incapable of handling his estate and affairs, the ranch had to be sold basically on a short sale against pending foreclosure. The loss, due to Defendants' negligence and breaches of fiduciary, was in excess of $12 million dollars.

## COUNTS

### Count I: Legal Malpractice and Negligence

62.     Plaintiffs restate the above allegations.

63.     Defendants at all relevant times were the attorneys for Larry and other Plaintiffs relative to the Weston Ranch property transactions.  Defendants owed minimum standards of care and duties to Larry and other Plaintiffs to represent their interests as would reasonably prudent attorneys. Defendants breached these standards and duties in many ways, including but not limited to:  representing Larry and Plaintiffs with known conflicts of interest; failing to advise Larry and Plaintiffs to seek independent counsel; failing to fully inform Larry and Plaintiffs of the significant conflicts and adverse implications to them relative to these transactions; self-dealing to the financial detriment of Larry and Plaintiffs; failing to secure adequate, informed written waiver of the conflicts of interests (however unenforceable); advising Larry and other Plaintiffs to enter into

the Weston Ranch transactions when Defendants knew or should have known that such transactions were to the financial detriment of Larry and Plaintiffs while benefiting Defendants' other clients including Petry, Kimble, and L.D. Hancock;  and failing to have adopted and implemented reasonable policies and procedures for identifying, assessing and avoiding conflicts of interest and self-dealing by its attorneys relative to business transactions entered into with its clients. Such breaches directly and proximately caused significant economic loss and damages to Larry and other Plaintiffs.

Count II: Breach of Fiduciary Duty

64.     Plaintiffs restate the above allegations.

65.     Defendants at all relevant times were the attorneys for Larry and other Plaintiffs relative to the Weston Ranch property.  There existed a special relationship of trust and confidence that Larry and other Plaintiffs had toward their attorney Defendants. Certainly, the legal and business expertise of Defendants far exceeded Larry's knowledge of the complicated business transactions subject to this Complaint. Larry and the other Plaintiffs paid significant legal fees to Defendants to protect their interests in the Weston Ranch transactions. Larry and Plaintiffs put their trust and confidence in Defendants to act in their best interests and not Defendants' self-interests. Larry and Plaintiffs reasonably expected Defendants to act in their interests as opposed to the interests of their other clients, Ranch Water and Minerals, Petry and Kimble.  Defendants owed a fiduciary duty to Larry and other Plaintiffs.

66.     Texas Pattern Jury Charge 104.2 is applicable to Defendants' fiduciary obligations to Larry and Plaintiffs. It requires the lawyer Defendants to show:

    a.   The transactions in question were fair and equitable to Larry and Plaintiffs;

    b.   Defendants made reasonable use of the confidence that Larry placed in

24

them;

   c.  Defendants acted in the utmost good faith and exercised the most scrupulous honesty toward Larry and Plaintiffs; and

   d.  Defendants placed the interests of Larry and Plaintiffs before their own, did not use the advantage of their position to gain and benefit for themselves at the expense of Larry and Plaintiffs, and did not place themselves in any position where their self-interests might conflict with their obligations as fiduciaries.

The subject transactions and Defendants' conduct failed to satisfy any of the above.

67.    Defendants improperly benefited from the attorney-client relationship by, among other things, subordinating Larry's and other Plaintiffs' interests to their own, taking advantage of the Plaintiffs' trust in them, engaging in self-dealing, and taking advantage of Larry's mental disabilities. Further, while the substantial conflicts of interests between Larry/Plaintiffs and Defendants were not waivable, Defendants improperly benefited from the attorney-client relationship by engaging in conflicts of interest, failing to disclose such conflicts to Larry and other Plaintiffs, failing to advise Larry and other Plaintiffs to seek independent counsel, and/or failing to secure informed waivers of such conflicts. The actions of Defendants constitute a breach of the fiduciary duties owed to Larry and other Plaintiffs. Such breaches directly and proximately caused significant economic loss and damages to Larry and to other Plaintiffs.[4]

<u>Count III: Conspiracy to Breach Fiduciary Duties</u>

68.    Plaintiffs restate the above allegations.

---

[4] Evidence that the loyalties of Defendants were directed toward Petry, Kimble and LB's other clients rather than Larry and Plaintiffs is illustrated in February 7-8, 2013 email exchanges between Petry and Rouse attached hereto as **Exhibit** "W". In it, Rouse, who was supposed to have been representing Larry and Plaintiffs, is taking directions from his boss Petry regarding the allocation of $2 million dollars from Larry and Plaintiffs directly to Petry and his friend Kimble (i.e., both of whom were other clients of LB). Also, the February 20, 2013 email from Rouse to Petry, Kimble and the other Estate Commodity principals attached as **Exhibit** "X" totally excludes Larry even though Larry was Rouse's client and the email was finalizing the details of the February 28th purchase of Larry's ranch by the Petry group.

69.     At all relevant times, Defendants acted together in furtherance of a common purpose. That purpose was to represent clients with conflicting interests and structure the subject Weston Ranch transactions to benefit Petry and his friends all to the financial detriment of Larry and Plaintiffs. Defendants had a meeting of the minds. They understood the purpose and engaged in overt acts of professional negligence and breaches of fiduciaries in furtherance of the common purpose constituting a civil conspiracy.

70.     As a direct and proximate result of Defendants' overt acts of professional negligence and breaches of fiduciaries, Larry and Plaintiffs suffered millions of dollars in financial losses. Defendants as co-conspirators are liable individually, vicariously, jointly and severally, for the damages caused by every tortious act of any of such co-conspirator.

<u>Count IV: Fraud</u>

71.     Plaintiffs restate the above allegations.

72.     At all relevant times, Defendants as fiduciaries and as attorneys representing Plaintiffs owed duties to disclose to Plaintiffs all material facts relating to existence, nature, implications, and possible adverse consequences of the common representation of the multiple parties to the subject transactions.

73.     Relative to the 2012 Weston Ranch transactions, these duties required among other things the disclosure:

a.      That Plaintiffs had no duty or obligation (nor was it in their best interest) to transfer ownership interest of the ranch to LD Hancock;

b.      That Plaintiffs had no duty or obligation (nor was it in their best interest) to enter into a debt instrument obligating H Sycamore to pay LD Hancock $7,104,076.96.

c.      That Defendants, as attorneys for LD Hancock as well as Plaintiffs, owed duties to advise LD Hancock and protect its interests though such advice and interests were in direct conflict with those of Plaintiffs;

d.      That the interests of its client LD Hancock were grossly adverse with those of Plaintiffs; and

e.      That Defendants were ethically bound to secure from all such parties/clients written waivers of conflict after full disclosure of the nature, implications and possible adverse consequences of the common representation.

74.      Relative to the 2013 Weston Ranch transactions, these duties required among other things the disclosure:

a.      That Defendants, as attorneys for LD Hancock, Larry and his Sycamore entities, Petry and his trust, Kimble and his trust, the Spears/Gough Group, and Mueller, owed duties to advise all of said parties/clients and protect their interests though such advice and interests were in direct conflict with those of Plaintiffs;

b.      That the interests of such parties/clients were grossly adverse with those of Plaintiffs;

c.      That Plaintiffs had no duty or obligation (nor was it in their best interest) to grant to Petry, Kimble, Mueller, and/or LB the fees or commissions provided for in these transactions;

d.      That Defendants prior to the 2013 transactions had actual knowledge of imminent pipeline easement deals with Weston Ranch that would generate millions of dollars; and

e.      That Defendants were ethically bound to secure from all such parties/clients

written waivers of conflict after full disclosure of the nature, implications and possible adverse consequences of the common representation.

75.     Relative to the 2016 Weston Ranch transactions, these duties required among other things the disclosure:

    a.     That Defendants, as attorneys for Larry and his Sycamore entities, Petry and his trust, Kimble and his trust, the Gough Group, and Mueller, owed duties to advise all of said parties/clients and protect their interests though such advice and interests were in direct conflict with those of Plaintiffs;

    b.     That the interests of its such parties/clients were grossly adverse with those of Plaintiffs;

    c.     That Plaintiffs had no duty or obligation (nor was it in their best interest) to enter into the A&R LD Note and reinstate the debt obligation (increased to $8,001,250.37) that had been released and paid in full pursuant to the 2013 transactions;

    d.     That Larry had no duty or obligation to waive his $7,500,000 inheritance in exchange for payment of a debt obligation that did not exist;

    e.     That Plaintiffs had no duty or obligation (nor was it in their best interest) to grant to Petry, Kimble, Mueller, and/or LB the fees or commissions provided for in these transactions;

    f.     That Plaintiffs had no duty or obligation (nor was it in their best interest) to allow Estate Commodity (after the October 2016 transaction) to continue to hold title to Weston Ranch and extend until June 30, 2018 its first payment obligation to allow Petry and his friends additional time to market the property in hope for

significant profits and fees; and

g.      That Defendants were ethically bound to secure from all such parties/clients written waivers of conflict after full disclosure of the nature, implications and possible adverse consequences of the common representation;

76.     Relative to the 2018 Weston Ranch transactions, these duties required among other things the disclosure:

a.      That Defendants, as attorneys for Larry and his Sycamore entities, Petry and his trust, Kimble and his trust, the Gough Group, and Mueller, owed duties to advise all of said parties/clients and protect their interests though such advice and interests were in direct conflict with those of Plaintiffs;

b.      That Plaintiffs had no duty or obligation (nor was it in their best interest) to allow Petry and his friends until October 29, 2018 (months after execution of the Deed in Lieu of Foreclosure) to sell the ranch and earn potentially millions in profits, fees and commissions; and

c.      That Defendants were ethically bound to secure from all such parties/clients written waivers of conflict after full disclosure of the nature, implications and possible adverse consequences of the common representation.

77.     Defendants knew that Plaintiffs were ignorant of the above undisclosed facts and did not have an equal opportunity to discover the truth.

78.     Defendants intended through such non-disclosures to induce the Plaintiffs to enter into the above transactions.

79.     Plaintiffs suffered significant monetary injury as a result of acting without knowledge of the above undisclosed facts.

80.     The conduct of Defendants is violative of TDRPC 8.04(a)(3). The actions and inactions of Defendants involved dishonesty, fraud and deceit.

81.     Plaintiffs allege each element of fraud for failing to disclose as set forth in Texas Pattern Jury Charges 105.4, Business, Consumer, Insurance and Employment (18th Ed.)

<u>Fraud With More Particularity</u>

82.     Plaintiffs in their Complaint filed in Texas state court pled fraud with specificity against all defendants including Rouse. The fraud was extensive and included fraudulent misrepresentation, fraudulent nondisclosure, and multiple fraudulent forgeries. While Plaintiffs (following Rouse's "snap removal" to federal court) have filed a response in opposition to Rouse's Fed. R. Civ. P. 9(b) motion to dismiss the fraud claims against him, Plaintiffs out of an abundance of caution have restated their fraud claims with more specificity in this proposed First Amended Complaint. All of the misrepresentations set forth in the below referenced documents were made by Rouse, Werner and Petry (and, some, by Brook) in their law offices while in the course of drafting and editing the documents. Further, on information and belief the same misrepresentations made in the referenced documents were repeated orally to Larry/Sycamore by Rouse, Werner and/or Petry at or around the time of the subject transactions. And, while Plaintiffs at this time have not identified the specific forger(s), Plaintiffs allege that at all relevant times the forged documents referenced below were in the exclusive control and possession of Defendants and/or their agents. Plaintiffs further allege that attorney defendant Werner as a notary falsely and fraudulently represented that he witnessed Larry Hancock (while Mr. Hancock was NCM) sign material documents (that Mr. Werner, in fact, did not witness).

83.1 **The 2013 Transactions**

A.     <u>February 28, 2013 WRA</u>

1.     In or around February 2013 Rouse, Werner and Petry worked together to draft the 2/28/2013 WRA. Petry, relative to the WRA, had a self-interest in the subject property transaction of his clients Larry Hancock and the Sycamore entities. Rouse, at all relevant times, was an associate and subordinate of Petry in the LB firm. Werner, at all relevant times, was a junior partner to Petry in the LB firm. Petry, at all relevant times, directed Rouse and Werner. Rouse and Werner included no provisions in the WRA without the express consent and direction of their superior Petry; notwithstanding the adverse consequences to their clients Larry Hancock and the Sycamore entities.  Rouse and Werner at all times knew of the conflicts and self-dealing and knew that the subject transactions were adverse to their clients Larry Hancock and the Sycamore entities but nonetheless drafted the WRA to benefit their boss Petry and his friends to the detriment of their clients Hancock and Sycamore.

2.     LB invoice NO. 19118 dated 4/11/2013 [attached hereto as Exhibit Y] shows that in January 2013 and February 2013 alone Rouse and Werner logged nearly 170 hours preparing the 2013 February 28, 2013 WRA transactional documents; and meeting, emailing, and calling their "clients" Petry, Spears, Gough, and Kimble. **Not one minute was logged that shows any communications with Larry Hancock.**

3.     The WRA was fraudulent on many levels:

i.      The sales price under the WRA for EC/Petry's purchase of Plaintiffs' Weston Ranch was $22.5 million although Rouse, Werner and Petry valued the property at over $100 million. [See letter Petry to Greer dated 9.21.2018, attached hereto as Exhibit F.] Rouse, Werner and Petry in violation of the Texas Disciplinary Rules of Professional Conduct failed to disclose to Larry/Sycamore their valuation of the ranch in order to fraudulently induce Larry/Sycamore to sell

the ranch for $22.5 million. Said defendants had actual knowledge of valuation; knew that the valuation was material; knew that Larry was ignorant of the valuation and had no opportunity to discover the valuation; and intended for their clients Larry/Sycamore to enter into the 2013 WRA by failing to disclose the valuation. Larry/Sycamore in fact entered into the 2013 WRA and suffered financial harm as a proximate result.

ii.    The WRA required no down payment by the buyers EC/Petry to the seller and their client Larry/Sycamore for the purchase the 12,572-acre ranch. Rouse, Werner and Petry in violation of the Texas Disciplinary Rules of Professional Conduct relative to attorney self-dealing with their own clients failed to disclose to Larry/Sycamore that such a provision was not fair and reasonable.

iii.    This first payment on the $22.5 million note from EC/Petry to Larry/Sycamore was not due until 4 years after the purchase. Rouse, Werner and Petry in violation of the Texas Disciplinary Rules of Professional Conduct relative to attorney self-dealing with their own clients failed to disclose to Larry/Sycamore that such a provision was not fair and reasonable.

iv.    The interest rate on the $22.5 million note from EC/Petry to Larry/Sycamore was well below the market. Rouse, Werner and Petry in violation of the Texas Disciplinary Rules of Professional Conduct relative to attorney self-dealing with their own clients failed to disclose to Larry/Sycamore that such a provision was not fair and reasonable.

v.    The WRA provided for Petry and his friend Kimble to receive at least $1 million each as "commissions" for their purchase of the Weston Ranch

from Larry/Sycamore (i.e., Petry was to get a $1 million "brokerage" commission for his own purchase of the ranch). Rouse, Werner and Petry in violation of the Texas Disciplinary Rules of Professional Conduct relative to attorney self-dealing with their own clients failed to disclose to Larry/Sycamore that such a provision was not fair and reasonable.

       vi.      At the time of the WRA, Rouse, Werner and Petry failed to disclose to Larry/Sycamore their knowledge that contracts for pipeline easements through the Weston Ranch were imminent and would generate millions of dollars for the owner of Weston Ranch. Soon after EC/Petry's purchase of the Weston Ranch, the pipeline easement contracts were finalized by Rouse, Werner and Petry and Petry enjoyed the benefit of lease payments that should have inured to his clients Larry/Sycamore.

       vii.      Defendants Rouse, Werner, Petry, and LB misrepresented that LB would provide the payment breakdown for receipt and distribution of any proceeds and would secure Larry's/Sycamore's signature or approval.  The only payment breakdown secured was on November 21, 2013.  This material misrepresentation was knowingly and intentionally false. It was made with knowledge of its falsity or made recklessly without any knowledge of its truth and as a positive assertion. Said defendants intended that it would be relied on and/or acted on by Larry/Sycamore. It was so relied on by Larry/Sycamore and such reliance proximately caused significant damages to Larry/Sycamore.

    4.      The above nondisclosures were material. Said defendants had actual knowledge of the above; knew that Larry was ignorant of the above facts and had no opportunity to discover the

above facts; and intended for their clients Larry/Sycamore to enter into the 2013 WRA by failing to disclose the above facts. Larry/Sycamore in fact entered into the 2013 WRA and suffered financial harm as a proximate result.

    B. February 28, 2013 Note From EC/Petry to Larry/Sycamore

1.      On or about February 28, 2013, Rouse, Werner and Petry worked together to draft a $22.5 million dollar debt instrument from EC/Petry to their clients Larry/Sycamore with terms unreasonably favoring Petry and friends and adverse to their clients Larry/Sycamore. [Note attached hereto as Exhibit Z] Rouse, at all relevant times, was an associate and subordinate of Petry in the LB firm. Werner, at all relevant times, was a junior partner to Petry in the LB firm. Petry, at all relevant times, directed Rouse and Werner. Rouse and Werner included no provisions within said Note without the express consent and direction of their superior Petry; notwithstanding the adverse consequences to their clients Larry Hancock and the Sycamore entities. Rouse and Werner at all times knew of the conflicts and self-dealing and knew that the subject transactions were adverse to their clients Larry Hancock and the Sycamore entities but nonetheless drafted the Note to benefit their boss Petry to the detriment of their clients Hancock and Sycamore.

2.      The Note was fraudulent on many levels:

        i.      The 2013 Note required no down payment by the buyers EC/Petry to the seller and their client Larry/Sycamore to purchase the 12,572-acre ranch. Rouse, Werner and Petry in violation of the Texas Disciplinary Rules of Professional Conduct relative to attorney self-dealing with their own clients failed to disclose to Larry/Sycamore that such a provision was not fair and reasonable.

        ii.     This first payment on the $22.5 million 2013 Note from EC/Petry to Larry/Sycamore was not due until 4 years after the purchase. Rouse, Werner and

Petry in violation of the Texas Disciplinary Rules of Professional Conduct relative to attorney self-dealing with their own clients failed to disclose to Larry/Sycamore that such a provision was not fair and reasonable.

      iii.    The interest rate on the $22.5 million 2013 Note from EC/Petry to Larry/Sycamore was well below the market. Rouse, Werner and Petry in violation of the Texas Disciplinary Rules of Professional Conduct relative to attorney self-dealing with their own clients failed to disclose to Larry/Sycamore that such a provision was not fair and reasonable.

    3.    The above nondisclosures were material. Said defendants had actual knowledge of the above; knew that Larry was ignorant of the above facts and had no opportunity to discover the above facts; and intended for their clients Larry/Sycamore to enter into the 2013 Note by failing to disclose the above facts. Larry/Sycamore in fact entered into the 2013 Note and suffered financial harm as a proximate result.

    C.  The 2013 "Conflict Waiver"

    1.    On or about January 31, 2013, Rouse, Werner, Petry and Brook worked together to draft a "Letter Waiving Conflicts of Interest" [hereinafter sometimes referred to as the "2013 Conflicts Waiver", attached to the Original Complaint as Exhibit "S"] relative to the 2013 WRA. Rouse, at all relevant times, was an associate and subordinate of Petry in the LB firm. Werner, at all relevant times, was a junior partner to Petry in the LB firm. Petry, at all relevant times, directed Rouse and Werner.  Brook, at all relevant times, was the Managing Director of LB and an LB partner of equal standing to Petry in the LB firm. Rouse, Werner, and Brook included no provisions within the 2013 Conflict Waiver without the express consent and direction of Petry; notwithstanding the adverse consequences to their clients Larry Hancock and the Sycamore

entities.  Rouse, Werner, and Brook at all times knew of the conflicts and self-dealing of Petry and knew that the subject transactions were adverse to their clients Larry Hancock and the Sycamore entities but nonetheless drafted (and Brook executed) the 2013 Conflicts Waiver all to the benefit of Petry and to the detriment of their clients Larry/Sycamore.

2.   Invoice NO. 198118 dated April 11, 2013, shows that Rouse revised the 2013 Conflicts Waiver per the "outcome of meeting" with Werner and his client Spears Gough Group, LLC – but not Larry Hancock.

3.   The 2013 Conflicts Waiver was fraudulent on many levels:

i.   First, it is a forgery. The 2013 Conflicts Waiver was not signed by Larry Hancock as purported. While the forger is presently unknown, the forged document at all relevant times was in the exclusive possession of Defendants. Pursuant to the principle of res ipsa loquitor the 2013 Conflicts Waiver must have been forged by someone within the defendant LB.

ii.   Second, even if had been signed by Larry Hancock (and it was not), the 2013 Conflicts Waiver on its face is in furtherance of a fraud because:

a.   The 2013 Conflicts Waiver (signed by Brook of LB) states that Petry (of LB) himself "asked" Rouse (his associate at LB) and Werner (his junior partner at LB) to represent Larry/Sycamore in this multi-million-dollar business transaction between Petry (of LB) and LB's client Larry/Sycamore; while at the same time representing Petry (of LB). Defendants failed to disclose to Larry/ Sycamore that such transactions (under these circumstances) were prohibited under the Texas Disciplinary Rules of Professional Conduct.

b.      The 2013 Conflicts Waiver on its face fails to comply with Rule 1.06 of the Texas Disciplinary Rules of Professional Conduct. Rouse, Werner, Brook and Petry had actual knowledge that the interests of Larry/Sycamore would be materially, adversely affected by their representation of Petry and other parties to the transaction. They had a duty to disclose to Larry/Sycamore the existence, nature, implications, and possible adverse consequences of the common representation.

c.      The 2013 Conflicts Waiver on its face fails to comply with Rule 1.08 of Texas Disciplinary Rules of Professional Conduct. Rouse, Werner, Brook and Petry had actual knowledge that the interests of Larry/Sycamore would be materially, adversely affected by their representation of Petry and other parties to the transaction. They had a duty to ensure that:

(1)      the transaction and terms on which Petry acquires an interest in Weston Ranch are fair and reasonable to Larry/Sycamore and are fully disclosed in a manner which can be reasonably understood by Larry/Sycamore;

(2)      Larry/Sycamore was given a reasonable opportunity to seek the advice of independent counsel in the transaction; and

(3)      Larry/Sycamore consented in writing thereto.

4. Defendants intentionally and knowingly breached the above ethical rules for purposes of advancing the interests of their boss/partner Petry to the detriment of their clients Larry/Sycamore. If not for the above intentional acts and nondisclosures, Larry/Sycamore would

not have entered into the transactions that harmed him and benefited Petry.

5.   Such intentional conduct proximately caused significant monetary loss to Plaintiffs.

6.   Rouse, Werner, Brook and Petry in the 2013 Conflicts Waiver falsely represented that the interests of Petry and Plaintiffs and the other parties to the 2013 transaction were "substantially aligned." Such misrepresentation was knowingly false. Though Larry/Sycamore on information and belief were never provided a copy of the 2013 Conflicts Waiver, on information and belief Rouse, Werner, and Petry intentionally and falsely led Larry/Sycamore to believe that his interests were "substantially aligned" with Petry and his friends. Larry/Sycamore to their detriment relied on this false representation and relied on their belief that Rouse, Werner, Brook and Petry would comply with the rules of ethics. Such reliance proximately caused significant losses to Larry/Sycamore.

7.   Rouse, Werner, Brook and Petry in the 2013 Conflicts Waiver falsely represented to Larry/Sycamore that neither Rouse nor Werner would provide advice to Petry (or other parties to the transaction) against the interests of Larry/Sycamore.   Though Larry/Sycamore on information and belief were never provided a copy of the 2013 Conflicts Waiver, on information and belief Rouse, Werner, and Petry intentionally and falsely led Larry/Sycamore to believe that they would not advise Petry (or other parties) on issues against the interest of Larry/Sycamore. Larry/Sycamore to their detriment relied on this false representation and relied on their belief that Rouse, Werner, Brook and Petry would comply with the rules of ethics. Such reliance proximately caused significant losses to Larry/Sycamore.

8.   Rouse, Werner, Brook and Petry in the 2013 Conflicts Waiver falsely represented to Larry/Sycamore that they would advise Larry/Sycamore to seek advice from counsel other than LB if they determined that a conflict existed between the interests of Larry/Sycamore and Petry

and/or the other parties. They provided no such advice and never intended to provide such advice. Though Larry/Sycamore on information and belief were never provided a copy of the 2013 Conflicts Waiver, Rouse, Werner, Brook and Petry owed a duty to so advise Larry/Sycamore and intentionally breached such duty for the benefit of Petry and his friends and to the detriment of Larry/Sycamore. Larry/Sycamore, as a matter of law, were entitled to rely on and in fact did rely on Rouse, Werner, Brook and Petry to comply with the Texas Disciplinary Rules of Professional Conduct. Such reliance caused significant losses to Larry/Sycamore.

D. The 2013 Farm and Ranch Contract

1.    On or about February 15, 2013, Rouse, Werner and Petry drafted the Farm and Ranch Contract [Exhibit "D" to Original Complaint]. In the contract, Rouse was named as the attorney for the BUYER (EC/Petry). Petry was named as attorney for the SELLER (Larry/Sycamore); even though the 2013 Conflicts Waiver discussed above claims that Petry represented no one and that Rouse and Werner represented Larry/Sycamore. This material misrepresentation, i.e., that Petry was protecting the interests of Larry/Sycamore in the subject transaction, was knowingly and intentionally false. It was made with the intent that it would be relied on and/or acted on by Larry/Sycamore. It was so relied on by Larry/Sycamore and such reliance proximately caused significant damages to Larry/Sycamore.

2.    Paragraph 8 of the Farm and Ranch Contract includes the "BROKER'S FEES" to be paid to Petry (Plaintiffs' then-attorney), Kimble (Petry's friend) and another. The contract, however, makes no reference to the separate "Commission Agreement" (attached hereto as Exhibit AA), which entitles Petry to an "additional" $1 million fee and entitles his friend Kimble to an "additional" $1 million fee.  Rouse, Werner and Petry owed a duty to Larry/Sycamore to advise them that the fees to be paid to Petry and his friends were unconscionable and unreasonable

and inconsistent with the Farm and Ranch Contracts. Rouse, Werner and Petry had actual knowledge that Larry/Sycamore were ignorant of these facts and did not have an equal opportunity to discover the truth. Said defendants intentionally failed to disclose these material facts to induce Larry/Sycamore to enter into the Farm and Ranch Contract.  Larry/Sycamore would not have entered into such transactions absent these nondisclosures. Such nondisclosures proximately caused significant monetary loss to Larry/Sycamore.

       3.      Section 11, paragraph J states that the buyer (i.e., EC/Petry) accepts the ranch "AS IS" and with "WITH ALL FAULTS." Paragraph N discloses that the roof of the residence on Weston Ranch was in need of repair and the house had other deficiencies; but that the buyer (i.e., EC/Petry) was responsible. Notwithstanding these provisions in the contract, EC/Petry unilaterally deducted $100,000 from Larry's pipeline proceeds for repairs of this nature – all without his knowledge or consent and in violation of the express terms of the contract.  On information and belief, Rouse, Werner and Petry had actual knowledge of these transactions and terms but intentionally failed to disclose them to Larry/Sycamore for purposes of benefiting Petry to the detriment of their clients Larry/Sycamore.  Rouse, Werner and Petry owed a duty to Larry/Sycamore to advise Larry/Sycamore that EC/Petry had no right to deduct this $100,000 from their interest in the pipeline easement proceeds. Rouse, Werner and Petry had actual knowledge that Larry/Sycamore were ignorant of these facts and did not have an equal opportunity to discover the truth. Said defendants intentionally failed to disclose these material facts to Larry/Sycamore; which in turn allowed EC/Petry to convert the funds for its own use. Such nondisclosures proximately caused significant monetary loss to Larry/Sycamore.

    E. <u>The 2013 Commission Agreement</u>

       1.      Rouse drafted and/or participated in drafting all of the 2013 Weston Ranch

transactions. Specifically, LB Invoice 19118 shows that Rouse drafted the subject Commission Agreement [attached hereto as Exhibit Y] which allowed his boss Petry the potential for an "additional" $1 million commission above and beyond the "Broker's Fee" provided to Petry in the Farm and Ranch Contract discussed above (and above and beyond the attorney fees that he and LB would enjoy by drafting these subject documents, etc.). Rouse, Werner, and Petry had actual knowledge that such fees were unconscionable and unreasonable and that Larry/Sycamore were ignorant of such and did not have an equal opportunity to discover the truth. Despite this knowledge, to the knowing benefit of Petry and the detriment of their clients Larry/Sycamore, said defendants intentionally failed to disclose to Larry/Sycamore that such fees were unconscionable and unreasonable and in conflict with the Farm and Ranch Contract. Such nondisclosures proximately caused significant monetary loss to Larry/Sycamore.

83.2. **The 2016 Transactions**

1.      In 2016, with the February 2017 payment deadline on the horizon for the EC Group/Petry, Defendants, without advising Larry/Sycamore of any conflict of interest or potential conflict of interest, opened a client/matter titled "Defend Mr. Hancock on Collection of Debt."

2.      Larry Hancock did not owe any debt from the time the real estate lien note was released on February 28, 2013 until October 7, 2016.  Defendants conspired to release the EC Group/Petry from their debt obligation by fraudulently placing the debt obligation on Larry/Sycamore for the EC Group's purchase of the Weston Ranch property, and charging legal fees to Larry for amending the transaction on October 7, 2016, all to the detriment of their client, Larry/Sycamore.

3.      Rouse, Werner and Petry consulted with each other and counsel for LDH in person, by email and through telephone calls under the guise of "defending Mr. Hancock on collection of

debt" in order to amend the terms of the 2013 transaction. The invoice for the matter was addressed to "Larry Hancock c/o Brady Kimble" at Mr. Kimble's address. Brady Kimble is a close associate of Petry and a member of the EC Group (buyer of the Weston Ranch from Larry/Sycamore).

4.      Rouse, Werner, and Petry intentionally and fraudulently concealed and withheld information from Larry/Sycamore in regard to any defenses to a potential debt collection action, such as the fact that the debt was owed by the EC Group and not Larry/Sycamore, the LDH lien had been released, and any debt collection action against Larry/Sycamore would be barred by the applicable statute of limitations and the non-recourse agreement.

5.      Rouse, Werner and Petry were aware that Larry was experiencing cognitive issues and nonetheless intentionally ignored those issues and took advantage of Larry's mental condition in order to benefit Petry and friends, the EC Group, and to the detriment of their clients, Larry/Sycamore. There is uncontradicted medical proof from three qualified physicians that Larry was NCM and suffering from Lewy Body Dementia on 10/7/2016 when the ARWRA and other transactional documents were executed. They were intentionally taking advantage of Larry's mental state and advising him to execute the ARWRA and other related documents when he was incapable of understanding the full impact of the complicated documents.

6.      Petry, relative to the ARWRA, its Exhibits and other transactional documents, had a self-interest in the subject property transaction of his clients Larry Hancock and the Sycamore entities. Rouse, at all relevant times, was an associate and subordinate of Petry in the L&B firm. Werner, at all relevant times, was a junior partner to Petry in the L&B firm. Petry, at all relevant times, directed Rouse and Werner. Rouse and Werner included no provisions in the ARWRA without the express consent and direction of their superior Petry; notwithstanding the adverse consequences to their clients Larry Hancock and the Sycamore entities. Rouse and Werner at all

times knew of the conflicts and self-dealing and knew that the subject transactions were adverse to their clients Larry Hancock and the Sycamore entities, but nonetheless drafted and edited the ARWRA, its Exhibits and other related transactional documents to benefit their boss, Petry, and his friends (the EC Group) to the detriment of their clients, Hancock and Sycamore.  Although aware of the transactions involving Petry, a member of the law firm, and their clients, Larry and Sycamore, neither Brook nor any other member of the LB firm consulted with Larry, advised him to get independent counsel or presented a valid conflict waiver regarding the 2016 transactions.

7.     L&B Invoice No. 453082 dated November 11, 2016 and L&B Invoice No. 454692 dated December 15, 2016, attached hereto as Exhibit**s** "II" and "JJ" and incorporated herein by reference, reveal that Rouse, Werner and Petry had numerous discussions regarding the transactional documents, commission issues, and invoiced Larry for those documents and discussions.

8.     In preparing, editing and advising Larry to execute the 2016 transactional documents, Rouse, Werner and Petry committed actions and inactions which involved dishonesty, fraud and deceit.

9.     Rouse, Werner and LB fraudulently invoiced Larry for time spent to gain a renewal of the EC Group's loan and payment obligations and fraudulently convinced and advised Larry to execute the ARWRA agreement, a settlement transfer and release document, an amended and restated real estate lien note, a subordination agreement, revised deeds of trust and other transactional documents which were adverse to his best interest and which benefited the EC Group.

10.    The ARWRA, its Exhibits and the other related transactional documents were fraudulent on many levels:

a.     Rouse, Werner and Petry failed to disclose to Larry/Sycamore that prior to

the execution of the 10/7/2016 ARWRA, Larry/Sycamore owed no debt to LDH, that any debt Larry/Sycamore had owed to LDH in the past had been resolved by the buyers, EC/Petry's obligation and agreement under the 2013 WRA, Note and Deed of Trust to pay Larry/Sycamore and LDH for the purchase of the ranch property under the terms of the 2013 WRA, and that the execution of the 10/7/2016 ARWRA would cause Larry/Sycamore to be responsible for payment of $15 million of the debt owed by the buyers, EC/Petry ("Makers" of the 2013 Note, Deeds of Trust and debt obligations) under the then existing 2013 WRA.  Rouse, Werner and Petry fraudulently failed to disclose to Larry/Sycamore that such provisions were not fair and reasonable or that he should obtain independent counsel.

b.     The 2016 ARWRA amended the terms of the 2013 WRA, all of which benefited EC/Petry, and none of which benefited Larry/Sycamore.   There was no consideration given to Larry/Sycamore for the amended terms, including but not limited to the deferment of the initial down payment obligation of the buyers, EC/Petry until June 30, 2018.   Rouse, Werner and Petry, in violation of the Texas Disciplinary Rules of Professional Conduct, relative to attorney self-dealing with their own clients, and otherwise, fraudulently concealed and failed to disclose to Larry/Sycamore that there should have been consideration to Larry/Sycamore for the deferred payment terms under the ARWRA and fraudulently concealed and failed to disclose to Larry/Sycamore that such a provision was not fair and reasonable.

c.     The 2016 ARWRA amended the terms of the 2013 WRA, and created a "Family Obligation" and a "Settlement Obligation," neither of which existed under the terms of the 2013 WRA, which resulted in Larry losing his inheritance and signing an

"Amended and Restated Real Estate Lien Note" to LDH, all while NCM and suffering from Lewy Body Dementia.

     d.     The ARWRA granted a first priority lien to LDH against the property which allowed LDH to institute foreclosure proceedings against Larry/Sycamore, when there was no lien on the property from 2013-2016 other than the EC Group's lien in favor of Larry/Sycamore.  Rouse, Werner and Petry fraudulently concealed this information from Larry and negligently advised him to execute the ARWRA and the Amended and Restated Real Estate Lien Note granting LDH a first priority lien and subordinating the lien of the EC Group, which was payable to Larry/Sycamore.  The ARWRA, in Section 4.17, indicates that Rouse, Werner and LB represented Larry individually in connection with the transaction in terms of "reviewing, revising and preparing the Agreement."  Rouse, Werner, Petry and LB, in violation of the Texas Disciplinary Rules of Professional Conduct, relative to attorney self-dealing with their own clients, and otherwise, fraudulently concealed and failed to disclose to Larry/Sycamore that the ARWRA and Amended and Restated Real Estate Lien Note were adverse to his best interest and that such provisions were not fair and reasonable.

     e.     The Settlement, Transfer and Release document between Larry and his siblings, which Rouse, Werner and Petry advised Larry to execute on 10/7/16 referred to a "settlement note" which did not even exist.  Rouse, Werner and Petry fraudulently concealed this information from Larry and advised him to sign the document which made him liable for a non-existent note and exchange his rightful inheritance for a debt he did not owe.  Rouse, Werner and Petry, in violation of the Texas Disciplinary Rules of Professional Conduct, relative to attorney self-dealing with their own clients, and

otherwise, fraudulently concealed and failed to disclose to Larry/Sycamore that the Settlement, Transfer and Release document was adverse to his best interest and that such provisions were not fair and reasonable.

f.      The 2013 Deeds of Trust executed by the EC Group were revised and replaced in connection with the execution of the ARWRA.  The 2013 Deeds of Trust indicated that the EC Group's entities (EC) were the "borrowers" and Larry/Sycamore was the "lender."  The 2016 revised Deeds of Trust fraudulently changed Larry/Sycamore from "lender" to "borrower" and changed the EC Group entities from "borrowers" to "grantors" and added LDH as a "beneficiary."  Rouse, Werner and Petry fraudulently revised and replaced the deeds of trust to Larry's detriment and for the benefit of EC/Petry.  Rouse, Werner and Petry fraudulently concealed and failed to disclose this information to Larry. Rouse, Werner and Petry, in violation of the Texas Disciplinary Rules of Professional Conduct, relative to attorney self-dealing with their own clients, and otherwise, fraudulently concealed and failed to disclose to Larry/Sycamore that accepting the revised Deeds of Trust was adverse to his best interest and that such provisions were not fair and reasonable.

g.      There was no consideration to Larry/Sycamore for executing and delivering the Amended and Reinstated Real Estate Lien Note.  Rouse, Werner and Petry, in violation of the Texas Disciplinary Rules of Professional Conduct, relative to attorney self-dealing with their own clients, and otherwise, fraudulently concealed and failed to disclose to Larry/Sycamore that executing the Amended and Reinstated Real Estate Lien Note for no consideration was adverse to his best interest and would benefit the EC Group to his detriment and that said provisions were not fair and reasonable.

11.     The Defendants wholly failed to comply with Rules 1.06 and 1.08 of Texas Disciplinary Rules of Professional Conduct in connection with the 2016 transaction.  Rouse, Werner, Brook and Petry had actual knowledge that the interests of Larry/Sycamore would be materially, adversely affected by their representation of Petry and other parties to the transaction. They had a duty to ensure that:

a.     The 2016 transaction and terms which were revised from the 2013 transaction when the EC Group/Petry acquired an interest in Weston Ranch were fair and reasonable to Larry/Sycamore and were fully disclosed in a manner which could be reasonably understood by Larry/Sycamore;

b.     Larry/Sycamore was given a reasonable opportunity to seek the advice of independent counsel in the transaction; and

c.     Larry/Sycamore consented in writing thereto.

12.     Defendants intentionally and knowingly breached the above ethical rules for purposes of advancing the interests of their boss/partner Petry to the detriment of their clients Larry/Sycamore. If not for the above intentional acts, fraudulent concealment and nondisclosures, Larry/Sycamore would not have entered into the transactions that harmed him and benefited Petry. Such intentional conduct proximately caused significant monetary loss to Plaintiffs.   On information and belief Rouse, Werner, and Petry intentionally and falsely led Larry/Sycamore to believe that his interests were "substantially aligned" with Petry and his friends. Larry/Sycamore to his detriment relied on this false representation and relied on his belief that Rouse, Werner, Brook and Petry would comply with the rules of ethics. Such reliance proximately caused significant losses to Larry/Sycamore.

13.     On information and belief Rouse, Werner, and Petry intentionally and falsely led

Larry/Sycamore to believe that they would not advise Petry (or other parties) on issues against the interest of Larry/Sycamore.  Larry/Sycamore, to his detriment, relied on these false representations and relied on his belief that Rouse, Werner, Brook and Petry would comply with the rules of ethics. Such reliance proximately caused significant losses to Larry/Sycamore.

14.     Rouse, Werner, Brook and Petry owed a duty to Larry/Sycamore that they would advise Larry/Sycamore to seek advice from counsel other than L&B if they determined that a conflict existed between the interests of Larry/Sycamore and Petry and/or the other parties. They provided no such advice and never intended to provide such advice.  Rouse, Werner, Brook and Petry owed a duty to so advise Larry/Sycamore and intentionally breached such duty for the benefit of Petry and his friends and to the detriment of Larry/Sycamore. Larry/Sycamore, as a matter of law, was entitled to rely on and in fact did rely on Rouse, Werner, Brook and Petry to comply with the Texas Disciplinary Rules of Professional Conduct. Such reliance caused significant losses to Larry/Sycamore.

   A. <u>October 7, 2016 Amended Weston Ranch Agreement and Related Transactions</u>

1.     In October 2015 Larry's Mother, Ms. Elaine Hancock, passed away. On February 26, 2016 Gregory Pirkle, Esq., counsel for the Estate of Elaine Hancock, sent a letter (Exhibit BB attached hereto) to Petry as counsel for Larry. In it, Mr. Pirkle inexplicably threatened an imminent lawsuit against Larry unless Larry agreed to pay LDH $14,472,295.00 within 30 days. This demand included payment of the 2012 $7.1 million note that had been released and deemed paid in full in 2013. [Exhibit E] Though Larry/Sycamore was not in default of any obligation owed to LDH, Petry offered no defense; this despite Rouse, Werner, Petry and LB in or around April 2016 falsely representing to Larry/Sycamore that they were, "Defend[ing] Mr. Hancock on Collection Debt". [See LB Invoice #449077 dated August 3, 2016, attached hereto as Exhibit CC] Said

defendants intended for Larry/Sycamore to rely on this false representation and Larry/Sycamore in fact reasonably relied on this false representation to their detriment.

2.      In or around October 7, 2016, in response to the above demand from Pirkle, Rouse, Werner and Petry drafted the Amended Weston Ranch Agreement ["October 7, 2016 AWRA", Exhibit I to Original Complaint] and related transactions. Though Larry at this time was non compos mentis, said defendants caused Larry/Sycamore to enter into these transactions much to the detriment of Larry/Sycamore and to the benefit of EC/Petry. In violation of TDRPC 1.06 and 1.08, no conflict waiver was obtained.

3.      In Section 1.1 of the October 7, 2016 AWRA drafted by Rouse, Werner and Petry, said defendants falsely represented that:

> Despite language in the Release to the contrary, the Family Obligation has not been satisfied and remains outstanding. The balance owed pursuant to the Family Obligation as of October 7, 2016 is $8,001,250.37, and said obligation is evidenced by the AR L.D. Hancock Note (defined below).

> This material misrepresentation, i.e., that the "Family Obligation" remained outstanding, was knowingly and intentionally false. It was made with knowledge of its falsity or made recklessly without any knowledge of its truth and as a positive assertion. Said defendants intended that it would be relied on and/or acted on by Larry/Sycamore. It was so relied on by Larry/Sycamore and such reliance proximately caused significant damages to Larry/Sycamore.

4.      LB Invoice No. 451070 dated September 23, 2016, and LB Invoice No. 451876 dated October 12, 2016 [Exhibits DD and EE attached hereto] reveal that Rouse, Werner and Petry consulted with each other and counsel for LDH to attempt to "renew and gain an extension of the Estate Commodity loans and liens" while invoicing Larry for "Defending Mr. Hancock on collection of debt."  The invoices reveal that Rouse and Werner drafted the amendment to the Weston Ranch Agreement and forwarded it to Petry for his review and comment.  Rouse, Werner and Petry created, discussed, reviewed and revised the 2016 ARWRA and related transactional

documents.  The September and October invoices, likewise, were billed to Larry Hancock to "Defend Mr. Hancock on collection of debt," but addressed to Larry, c/o Brady Kimble, a member of the EC Group, at Mr. Kimble's address.

5.  The 2016 ARWRA further included a Special Durable Power of Attorney for Financial Transactions from Larry and other Plaintiffs granting LB, to the attention of Rouse, the authority to receive, endorse, negotiate and disburse all payments made on the Obligation (owed by EC).

6.  Defendants Rouse, Werner, Petry, and LB misrepresented that LB would provide the payment breakdown for receipt and distribution of any proceeds and would secure Larry's/Sycamore's signature or approval.  The only payment breakdown secured was on November 21, 2013.  This material misrepresentation was knowingly and intentionally false. It was made with knowledge of its falsity or made recklessly without any knowledge of its truth and as a positive assertion. Said defendants intended that it would be relied on and/or acted on by Larry/Sycamore. It was so relied on by Larry/Sycamore and such reliance proximately caused significant damages to Larry/Sycamore.

B.  October 7, 2016 Amended and Restated Real Estate Lien Note

1.  Rouse, Werner and Petry, drafted the October 7, 2016 Amended and Restated Real Estate Lien Note (the "2016 Note") wherein Larry/Sycamore became indebted to LDH for an amount in excess of $8 million.  The 2016 Note [Exhibit J attached to Original Complaint] obligates Larry/Sycamore to pay LDH $8 million for a debt that they did not owe; and an accompanying series of Deeds of Trust [Exhibits L-1 through L-6 to Original Complaint] grants to LDH a security interest in the Weston Ranch that LDH had previously released. [See also February 18, 2013 Release of Lien, attached to Original Complaint as Exhibit E.]

2.      In the 2016 Note, Rouse, Werner and Petry falsely represent that:

> THIS NOTE IS AN AMENDMENT AND RESTATEMENT OF THAT CERTAIN REAL ESTATE LIEN NOTE DATED FEBRUARY 7, 2012, EXECUTED BY BORROWER IN FAVOR OF AND PAYABLE TO LENDER IN THE ORIGINAL PRINCIPAL AMOUNT OF SEVEN MILLION ONE HUNDRED FOURTHOUSAND SEVENTY-SIX AND 96/100 DOLLARS ($7,104,076.96) (THE "PRIOR NOTE"). BORROWER ACKNOWLEDGES THAT THIS NOTE EXTENDS THE MATURITY DATE OF THE INDEBTEDNESS PROVIDED FOR IN THE PRIOR NOTE AT THE REQUEST AND TO THE BENEFIT OF BORROWER. BORROWER FURTHER ACKNOWLEDGES AND AGREES THAT DESPITE LANGUAGE CONTAINED IN THAT CERTAIN RELEASE OF LIEN DATED FEBRUARY 18, 2012 [sic] AND FILED IN BOOK 203, PAGE 118, OFFICIAL PUBLIC RECORDS OF KINNEY COUNTY, TEXAS, AND AS DOCUMENT NUMBER 00275970, OFFICIAL PUBLIC RECORDS. OF VAL VERDE COUNTY, TEXAS TO THE CONTRARY, THE PRIOR NOTE WAS NOT PAID IN FULL.

[2016 Note, Exhibit J to Original Complaint; emphasis added.]

3.      This material misrepresentation, i.e., that the $7.1 million obligation had not been deemed paid in full, was knowingly and intentionally false. It was made with knowledge of its falsity or made recklessly without any knowledge of its truth and as a positive assertion. Said defendants intended that it would be relied on and/or acted on by Larry/Sycamore. It was so relied on by Larry/Sycamore and such reliance proximately caused significant damages to Larry/Sycamore.

C.      2016 Subordination Agreement

1.      At the direction of Rouse, Werner and Petry, Larry/Sycamore on October 7, 2016 allegedly executed a Subordination Agreement [Exhibit K to Original Complaint] wherein the first priority lien that Larry/Sycamore had on Weston Ranch to secure the $22.5 million debt obligation owed to them by EC/Petry became subordinate to the $8 million debt obligation "now" owed by Larry/Sycamore to LDH. Defendant Werner, the attorney for Larry/Sycamore and a notary public, notarized the Subordination Agreement and claims to have personally witnessed Larry signing the document. This claim by Werner was a false representation as Larry was in Mississippi on October

7, 2016. [Also, see November 21, 2016 transmittal letter from Pirkle to Werner attached hereto as Exhibit FF.] On information and belief, Rouse and Petry were aware of Werner's false notarization. This material misrepresentation, i.e., that Werner witnessed Larry signing the Subrogation Agreement, was knowingly and intentionally false. It was made with knowledge of its falsity or made recklessly without any knowledge of its truth and as a positive assertion. Said defendants intended that it would be relied on and/or acted on by Larry/Sycamore. It was so relied on by Larry/Sycamore and such reliance proximately caused significant damages to Larry/Sycamore.

2.      In the October 7, 2016 Subordination Agreement drafted by Rouse, Werner and Petry, said defendants intentionally misrepresented that, "…DESPITE LANGUAGE CONTAINED IN THAT CERTAIN RELEASE OF LIEN … TO THE CONTRARY, THE PRIOR NOTE WAS NOT PAID IN FULL AND REMAINS OUTSTANDING AS EVIDENCED BY THE NOTE." [Exhibit I to Original Complaint; emphasis added.] Said defendants intended that Larry/Sycamore rely on this misrepresentation to their detriment. Larry/Sycamore in fact reasonably relied on this misrepresentation. As a proximate result, Larry/Sycamore suffered significant monetary damages.

D.      October 7, 2016 Settlement Transfer and Mutual Release Agreement

1.      Further, in the 2013 Weston Ranch transactions it was intended and agreed that EC/Petry (not Larry) would be responsible for the $7.395 million payment for Larry's "repurchase" of LDH's 37.75% interest in Sycamore. Nonetheless, Rouse, Werner and Petry who were supposed to have been representing Larry/Sycamore in the October 7, 2016 transactions shifted this obligation from EC/Petry to their client Larry and caused Larry to forfeit his $7.5 million inheritance in his Mother's estate as payment for the $7.395 debt owed by EC/Petry. [See

October 7, 2016 Settlement Transfer and Mutual Release Agreement attached hereto as Exhibit GG to be filed under seal, sometimes referred to as "2016 Settlement".] The 2016 Settlement was drafted by Rouse, Werner and Petry. To induce Larry to forfeit his inheritance, Rouse, Werner and Petry misrepresented to Larry in the 2016 Settlement that the $7.395 million was a personal debt obligation owed by him to LDH. Said defendants intended that Larry rely on this misrepresentation to his detriment. Larry in fact reasonably relied on this misrepresentation. As a proximate result, Larry suffered significant monetary damages.

83.3.   **The 2018 Transactions**

1.      In the spring of 2018, Larry's health was rapidly declining, he was confused, disoriented and suffering from hallucinations.  He was admitted to a mental health ward in Baptist Memorial Hospital, Booneville, Mississippi, on April 2, 2018 for treatment. Twelve Million Dollars ($12,000,000.00) was due to be paid by the EC Group/Petry toward the purchase of the property by June 30, 2018.  The payment was not made and the EC Group/Petry defaulted.

2.      After Larry's release from the mental health ward, he lived with his daughter in Tupelo, Mississippi, for several weeks until July 2018 when Petry and LB (to try to effectuate the July 2018 Deed in Lieu of Foreclosure and related fraudulent transactions) paid someone to secretly travel to Mississippi and physically take Larry to Texas without his doctor's or the family's knowledge or consent.

3.      LB Invoice No. 477454 dated August 8, 2018, attached hereto as Exhibit "HH," reveals that LB paid Ronda Hargrove, an associate of Petry, for transporting Larry from Mississippi to Texas.  Independent witnesses have confirmed that Ms. Hargrove is the individual who picked up Larry in Mississippi, while NCM, without his family's knowledge or consent, in order to transport him to Texas for Defendants' fraudulent purposes.

A.   The July 16, 2018 "Conflicts Waiver"

1.      On or about July 9, 2018, Rouse, Werner, Petry, and Brook worked together to draft a "Letter Waiving Conflicts of Interest" [hereinafter sometimes referred to as the "2018 Conflicts Waiver" attached to the Original Complaint as Exhibit "T"] relating to the 2018 transactions. Rouse, at all relevant times, was an associate and subordinate of Petry in the LB firm. Werner, at all relevant times in and around 2018 had opened his own firm, but was still working with the LB firm under the direction of Petry.  The 2018 Conflicts Waiver identifies Rouse, Werner and LB as "collectively LB."  Petry, at all relevant times, directed Rouse and Werner. Brook, at all relevant times, was the Managing Director of LB and an LB partner of equal standing to Petry in the LB firm. Rouse, Werner, and Brook included no provisions within the 2018 Conflict Waiver without the express consent and direction of Petry, notwithstanding the adverse consequences to their clients Larry Hancock and the Sycamore entities.  Rouse, Werner, and Brook at all times knew of the conflicts and self-dealing of Petry and knew that the subject transactions were adverse to their clients, Larry Hancock and the Sycamore entities, but nonetheless drafted (and Brook executed) the 2018 Conflicts Waiver, all to the benefit of Petry and the EC Group and to the detriment of their clients, Larry/Sycamore.

2.      Invoice No. 477454 dated August 8, 2018, reveals that Rouse drafted the 2018 Conflicts Waiver and revised it after discussing it with Brooks, Werner and Petry – but not Larry Hancock.

3.      The 2018 Conflicts Waiver was fraudulent on many levels:

i.   First, this alleged waiver was forged. Larry Hancock, the NCM, did not sign the waiver. While Plaintiffs at this time cannot identify the actual forger, Plaintiffs allege that at all relevant times this document was in the exclusive possession and control of

Defendants.

ii.     Second, even if it had not been forged, defendants Rouse, Werner, Petry and Brook drafted the document and it included the following false representations:

     a.     That LB was acting solely as a scrivener and was not providing legal advice to Larry/Sycamore or any other party to the transaction;

     b.     That LB is "merely documenting the terms in the Deed in Lieu Transaction as presented to it by each of you";

     c.     That LB "encouraged" Larry/Sycamore to seek separate legal counsel.

     d.     That the parties requested Rouse, Werner and LB to facilitate EC Group's transfer of title to the surface, minerals and commercial groundwater of the Weston Ranch back to Larry/Sycamore in lieu of foreclosure.  Larry/Sycamore made no such request.  At all relevant times, Larry was NCM and was not able to understand the complicated transaction or request the facilitation thereof.

iii.    The above misrepresentations by said defendants were material. They were knowingly and intentionally false. They were made with knowledge of their falsity or made recklessly without any knowledge of their truth and as positive assertions. Said defendants intended that the false representations would be relied on and/or acted on by Larry/Sycamore. They were so relied on by Larry/Sycamore and such reliance proximately caused significant damages to Larry/Sycamore.

iv.    Also, even if the 2018 Conflicts Waiver had been executed by Larry (and it was not), it evidences fraud for the following nondisclosures:

     a.     The 2018 Conflicts Waiver (signed by Brook of LB) states that the firm represents John W. Petry (of LB), Larry Hancock and Brady Kimble as part of

various business transactions (the "Weston Ranch Transactions").   Petry had himself "asked" Rouse (his associate at LB) and Werner (his junior partner at LB) to represent Larry/Sycamore in this multi-million-dollar business transaction between Petry (of LB) and LB's client Larry/Sycamore while simultaneously representing Petry (of LB). Defendants failed to disclose to Larry/Sycamore that such transactions (under these circumstances) were prohibited under the Texas Disciplinary Rules of Professional Conduct.

b.      The 2018 Conflicts Waiver on its face fails to comply with Rule 1.06 of the Texas Disciplinary Rules of Professional Conduct. Rouse, Werner, Brook, and Petry had actual knowledge that the interests of Larry/Sycamore would be materially, adversely affected by their representation of Petry and other parties to the transaction. They had a duty to disclose to Larry/Sycamore the existence, nature, implications, and possible adverse consequences of the common representation.

c.      The 2018 Conflicts Waiver on its face fails to comply with Rule 1.08 of Texas Disciplinary Rules of Professional Conduct. Rouse, Werner, Brook, and Petry had actual knowledge that the interests of Larry/Sycamore would be materially, adversely affected by their representation of Petry and other parties to the transaction.

4.      The above nondisclosures were material. Said defendants had actual knowledge of the above; knew that Larry was ignorant of the above facts and had no opportunity to discover the above facts; and intended for their clients Larry/Sycamore to enter into the 2018 transactions by failing to disclose the above facts. Larry/Sycamore suffered financial harm as a proximate result.

B. <u>The July 20, 2018 Agreement for Deed in Lieu of Foreclosure</u>

1.      First, the July 20, 2018 Agreement for Deed in Lieu of Foreclosure ("2018 Agreement") [Exhibit M to Original Complaint] was forged. Larry Hancock, the NCM, did not sign the 2018 Agreement. While Plaintiffs at this time cannot identify the actual forger, Plaintiffs allege that at all relevant times this document was in the exclusive possession and control of Defendants.

2.      Second, even if it had not been forged, defendants Rouse, Werner, and Petry drafted the 2018 Agreement as attorneys for Larry/Sycamore. They owed a duty to Larry/Sycamore to disclose to him that the terms of the 2018 Agreement were unfair and unconscionable to them while benefiting EC/Petry in that:

       i.      After defaulting on its $22.5 million obligation to Larry/Sycamore, it granted to EC/Petry an option or right of first refusal to purchase the ranch for $18,750,000 (while allowing EC/Petry to retain the water rights and requiring that Larry/Sycamore pay a $1 million commission to Kimble and Spears/Gough);

      ii.      It extended until October 15, 2018 the right of Kimble and Spears/Gough to market the ranch for a purchase price of $18,750,000 or greater (while allowing EC/Petry to retain the water rights and requiring that Larry/Sycamore pay a $1 million commission to Kimble and Spears/Gough); and

      iii.      If on or before October 15th a third party agreed to purchase the ranch for more than $18,750,000, EC/Petry could step in re-purchase the ranch from Larry/Sycamore for $18,750,000 and in a simultaneous closing sell it to the third party for the higher amount, thus shifting the profits from Larry/Sycamore to EC/Petry (while allowing EC/Petry to retain the water rights and requiring that

Larry/Sycamore pay a $1 million commission to Kimble and Spears/Gough).

3.      The above nondisclosures were material. Said defendants had actual knowledge of the above; knew that Larry was ignorant of the above facts and had no opportunity to discover the above facts; and intended for their clients Larry/Sycamore to enter into the 2018 Agreement by failing to disclose the above facts. Larry/Sycamore suffered financial harm as a proximate result.

C.   July 20, 2018 Durable Power of Attorney

1.      First, the July 20, 2018 Durable Power of Attorney ("2018 POA") [Exhibit U to Original Complaint] was forged. Larry Hancock, the NCM, did not sign the 2018 POA. While Plaintiffs at this time cannot identify the actual forger, Plaintiffs allege that at all relevant times this document was in the exclusive possession and control of Defendants. Larry's forged signature on the 2018 POA was allegedly notarized by LB employee Marla Stolberg. Plaintiffs requested Ms. Stolberg's "log book" for this period of time and have been informed that it cannot be found.

2.      Second, even if it had not been forged, defendants Rouse, Werner, and Petry drafted the 2018 POA as attorneys for Larry/Sycamore. They owed a duty to Larry/Sycamore to disclose to him that it was drafted to facilitate the unconscionable and unfair terms of the 2018 Agreement discussed above. Such was not disclosed.

3.      The above nondisclosure was material. Said defendants had actual knowledge of the above; knew that Larry was ignorant of the above facts and had no opportunity to discover the above facts; and intended for their clients Larry/Sycamore to enter into the 2018 POA by failing to disclose the above. Larry/Sycamore suffered financial harm as a proximate result.

D.   July 25, 2018 Notice Letter

1.      First, the July 25, 2018 letter purportedly from Larry to Haygood ("2018 Notice Letter") [Exhibit V to Original Complaint] was forged. Larry Hancock, the NCM, did not sign the

2018 Notice Letter. While Plaintiffs at this time cannot identify the actual forger, Plaintiffs allege that at all relevant times this document was in the exclusive possession and control of Defendants.

    2.        Second, even if it had not been forged, defendants Rouse, Werner, and Petry drafted the 2018 Notice Letter as attorneys for Larry/Sycamore. They owed a duty to Larry/Sycamore to disclose to him that it was drafted to facilitate the unconscionable and unfair terms of the 2018 Agreement discussed above. Such was not disclosed.

    3.        The above nondisclosure was material. Said defendants had actual knowledge of the above; knew that Larry was ignorant of the above facts and had no opportunity to discover the above facts; and intended for their clients Larry/Sycamore to enter transmit the 2018 Notice Letter by failing to disclose the above. Larry/Sycamore suffered financial harm as a proximate result.

    E.   <u>August 8, 2018 Fraudulent Invoice</u>

    1.        In furtherance of the above 2018 fraudulent transactions, Rouse, Petry and LB prepared an invoice for legal fees billed to "Petry, Kimble and Hancock" [attached hereto as Exhibit HH]. The invoice included over 28 hours logged by Rouse to prepare the fraudulent 2018 Deed in Lieu transaction – all to the benefit of EC, his boss Petry and his friends and to the detriment of Larry/Sycamore. Further, the almost $10,000 in billings was excessive. Rouse, Werner and Petry owed a duty to Larry/Sycamore to disclose to him that the "work" included in this invoice was to benefit Petry and his friends and not Larry/Sycamore. Such was not disclosed.

    2.        The above nondisclosure was material. Said defendants had actual knowledge of the above; knew that Larry was ignorant of the above facts and had no opportunity to discover the above facts; and intended for their clients Larry/Sycamore to pay the excessive invoice by failing to disclose the above. Larry/Sycamore paid the invoice and suffered financial harm as a proximate result.

3.      Additionally, and in furtherance of the fraud, Rouse in this invoice logged multiple hours on July 23, July 24, July 25, July 30, and July 31 allegedly revising the 2018 Agreement and 2018 Deed in Lieu documents. These entries were intentionally and knowingly false because the DEED IN LIEU TRANSACTIONS ALLEGEDLY CLOSED ON JULY 20, 2018.   The above misrepresentations by said defendants were material. They were knowingly and intentionally false. They were made with knowledge of their falsity or made recklessly without any knowledge of their truth and as positive assertions. Said defendants intended that the false representations would be relied on and/or acted on by Larry/Sycamore. They were so relied on by Larry/Sycamore and such reliance proximately caused significant damages to Larry/Sycamore.

### Count V: Forgery

83.      Plaintiffs restate the above allegations.

84.      Plaintiffs allege that the signatures on certain documents prepared by Defendants are not the genuine signatures of Larry Hancock but are in fact forgeries.  Tex. Pen. Code §32.21 defines forgery as altering, making, completing, executing or authenticating any writing so that it purports to be the act of another who did not authorize that act, so the document's action appears to have occurred at a different time or place than when or where it actually occurred or so that a copy of the document appears to be a copy of an original that does not actually exist.  It is also considered forgery to try and issue, register or pass off such an altered document as a true document, or to possess such a document with an intention to commit this type of act.  A person commits an offense of forgery if he forges a writing with intent to defraud or harm another.

85.      Although the conflicts of interest arising out of the 2013 transactions were not waivable, Defendants prepared a document titled "Letter Waiving Conflicts of Interest" dated January 31, 2013, a copy of which is attached hereto as Exhibit "S".

86.     Defendants committed forgery with the intent to defraud Larry and the other Plaintiffs by either affixing purported signatures of Larry Hancock, which were not genuine, on behalf of both Larry and the Sycamore entities to the January 31, 2013 Letter Waiving Conflicts of Interest or aided and assisted others in the forgery, all to the detriment of Larry and the other Plaintiffs and for the benefit of Defendants' other clients (EC), in direct conflict with the interests of Larry and other Plaintiffs.

87.     After Larry was released from a mental health ward in Baptist Memorial Hospital, Booneville, Mississippi, in April 2018 for treatment, he stayed with his daughter for several weeks until returning to Texas without his doctor's or the family's consent in July 2018.  Although Larry was NCM and the conflicts of interest arising out of the 2018 transactions were not waivable, Defendants prepared a document titled "Letter Waiving Conflicts of Interest" dated July 16, 2018, a copy of which is attached hereto as Exhibit "T."

88.     Defendants committed forgery with the intent to defraud Larry and the other Plaintiffs by either affixing the purported signatures of Larry Hancock, which was not genuine, on behalf of both Larry, individually, and on behalf of the Sycamore entities to the July 16, 2018 Letter Waiving Conflicts of Interest or aided and assisted others in the forgery, all to the detriment of Larry and the other Plaintiffs and for the benefit of Defendants' other clients (EC), in direct conflict with the interests of Larry and other Plaintiffs.

89.     Although Defendants were aware of Larry's mental health condition, they prepared a document entitled "Agreement for Deed in Lieu of Foreclosure" dated July 20, 2018, a copy of which is attached hereto as Exhibit "M," for Larry's signature.

90.     Defendants committed forgery with the intent to defraud Larry and the other Plaintiffs by either affixing the purported signatures of Larry Hancock, which were not genuine,

on behalf of both Larry, individually, and on behalf of the Sycamore entities to the July 20, 2018 Agreement for Deed in Lieu of Foreclosure, or aided and assisted others in the forgery, all to the detriment of Larry and the other Plaintiffs and for the benefit of Defendants' other clients (EC), in direct conflict with the interests of Larry and other Plaintiffs.

91.     Although Defendants were aware that Larry was NCM, they prepared a document titled "Durable Power of Attorney (Business and Financial)," a copy of which is attached hereto as Exhibit "U," for Larry's signature purportedly appointing Billy Haygood of Tupelo, Mississippi, as his agent and granting certain powers, including the authorization to complete a real estate transaction for the sale of the property known as the Weston Ranch, including authority to reconvey the property to Estate Commodity Ranch, LP on a right of first refusal agreement to reacquire the property for Eighteen Million Seven Hundred Fifty Thousand Dollars ($18,750,000), if said transaction was entered into before October 15, 2018.  The purchase price noted in the Power of Attorney for a reconveyance to Estate Commodity Ranch, LP was notably a reduction of Three Million Seven Hundred Eighty-Eight Thousand Dollars ($3,788,000) from the purchase price previously agreed to be paid by Defendants' other clients, EC.  The Power of Attorney also provided that if Billy Haygood was unable to serve or if his authority was terminated under Texas law, that Timothy Gilliam (the accountant for Defendants' other clients in the subject transactions – EC), as successor.  The appointment of either Mr. Haygood, the Manager of L. D. Hancock Company, LLC, one of the Defendants' other clients and the holder of the 2016 notes described herein, or Mr. Gilliam, the accountant for Defendants' other clients, EC/Petry, as the agent for Larry, was a clear conflict of interest.

92.     Defendants committed forgery with the intent to defraud Larry and the other Plaintiffs by either affixing the purported signature of Larry Hancock, which was not genuine, to

the Durable Power of Attorney, or aided and assisted others in the forgery, all to the detriment of Larry and the other Plaintiffs and for the benefit of Defendants' other clients (EC), in direct conflict with the interests of Larry and other Plaintiffs.  Defendants or others also changed the initial date on the Durable Power of Attorney to July 20, 2018, all for the benefit of EC and to the detriment of Larry and the other Plaintiffs.

93.     Defendants also prepared a July 25, 2018 letter to L. D. Hancock Company, LLC, a copy of which is attached hereto as Exhibit "V," for Larry's signature on behalf of the Sycamore entities, indicating that H. Sycamore Creek Ranch, LP was preparing to take possession of the Weston Ranch property (identified as the "Joint Collateral" as defined in the Subordination Agreement) as part of a deed in lieu of foreclosure process.

94.     Defendants committed forgery with the intent to defraud Larry and the other Plaintiffs by either affixing the purported signature of Larry Hancock, which was not genuine, on behalf of the Sycamore entities, to the July 25, 2018 letter to L. D. Hancock Company, LLC, or aided and assisted others in the forgery, all to the detriment of Larry and the other Plaintiffs and for the benefit of Defendants' other clients (EC), in direct conflict with the interests of Larry and other Plaintiffs.

95.     These actions by Defendants directly and proximately caused significant economic loss and damages to Larry and other Plaintiffs.

96.     By either affixing the purported signatures of Larry Hancock, which were not genuine, on behalf of Larry, individually, and the Sycamore entities to the subject documents, or aiding and assisting others in the forgeries, the Defendants' conduct violates Tex. Pen. Code §32.21 and such conduct rises to the level of a felony; therefore, the limitations on exemplary damage awards set out in Tex. Civ. Prac. & Rem. Code §41.008(b) do not apply.

<u>Count VI: Conversion</u>

97.     Plaintiffs restates the above allegations.

98.     As of February 28, 2013, Larry was the beneficiary of a Twenty-Two Million Five Hundred Thirty-Eight Thousand Dollars ($22,538,000.00) million debt obligation owed to him by Petry and related entities. This debt was an asset owned by Plaintiffs. On October 7, 2016 some or all of the Defendants assumed and exercised dominion and control over this asset in an unlawful and unauthorized manner inconsistent with Plaintiffs' rights. Plaintiffs have demanded reimbursement. Defendants have refused to reimburse.

99.     Defendants prior to February 28, 2013 had actual knowledge of imminent payment of substantial pipeline easements monies to Plaintiffs as owners of Weston Ranch. Defendants, nonetheless, caused Plaintiffs to transfer the Ranch to their other client Estate Commodity; and then unlawfully misappropriated such proceeds to their own benefit and to the detriment of Plaintiffs. Plaintiffs have demanded reimbursement. Defendants have refused to reimburse.

100.    Defendants in or 2018 collected substantial monies from a pipeline easement on Weston Ranch. Significant amounts of these monies were owed to Plaintiffs but Defendants unlawfully converted such monies in part to their own benefit and to the detriment of Plaintiffs. Plaintiffs have demanded reimbursement. Defendants have refused to reimburse.

101.    Plaintiffs, therefore, allege conversion and demand payment and/or return of the misappropriated monies proximately attributable to such conduct.

102.    During the course of such representation and breaches Petry, Werner and Rouse were at all times acting within the line and scope of their employment with LB. LB is vicariously liable for the torts of these attorneys.

### Count VII: Conspiracy to Breach Fiduciary and for Conversion

103.    Plaintiffs restate the above allegations.

104.    Defendants actively and overtly, with the full meeting of the minds, determined to engage in an unlawful course of action intended to commit unlawful conversion of Plaintiffs' property, all for the financial benefit of Defendants. Such conduct directly and proximately caused injury and damage to Plaintiffs and constitutes civil conspiracy for which Plaintiffs demand full compensation.

105.    During the course of such representation and breaches Petry, Werner and Rouse were at all times acting within the line and scope of their employment with LB. In addition to direct liability, LB is vicariously liable for the torts of these attorneys.

### Count VIII: Injunctive and Declaratory Relief

106.    Plaintiffs restate the above allegations.

107.    Plaintiffs invoke Tex. Civ. Prac. & Rem. Code Ann. §§ 37.001-.011 (West 2015) and request that the court and/or jury declare null, void and unenforceable the provisions of the Weston Ranch Agreement, attached as Exhibit "C," Article 4, sections 4.10 and 4.11, relative to waiver of a jury trial and mediation as a prerequisite to filing a lawsuit. Such provisions are unconscionable. They were drafted by Defendants solely for their own benefit to the detriment of Larry and Plaintiffs.

### Count IX: Punitive Damages / Gross Negligence

108.    The actions of Defendants clearly and convincingly constitute gross negligence within the meaning of Tex. Civ. Prac. & Rem. Code Ann. §§ 41.003, 41.001(7), and 41.001(11). Defendants' conduct caused substantial injury to Larry and other Plaintiffs. Further, Defendants' conduct, when viewed objectively from the standpoint of Defendants at the time of its occurrence

involves an extreme degree of risk, considering the probability and magnitude of the potential harm to Larry and other Plaintiffs, of which Defendants had actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of Larry and other Plaintiffs.

109.    Plaintiffs demand against Defendants, jointly and severally, all damages allowed by law including punitive damages sufficient to deter Defendants and others from similar conduct in the future.

<u>Count X:  Tolling of Limitations Period</u>

110.    Plaintiffs restate the above allegations.

111.    From at least 2015, during the subject attorney-client relationship through the present and during the tortious actions and inactions described in this Complaint, Larry was under a legal disability and of unsound mind within the meaning of Tex. Civ. Prac. & Rem. Code § 16.001(a)(2). Certainly, Larry was of unsound mind continuously on and before October 7, 2016 when Defendants advised Larry and other Plaintiffs to enter into the Weston Ranch transactions. This disability has been continuous from the dates prior to the accrual of the causes of action through the present. The limitation periods applicable to the causes of actions advanced in this Complaint are tolled through the present.

112.    Additionally, the "discovery rule" tolls the applicable limitation periods relative to all causes of action advanced in this Complaint.  Specifically, Plaintiffs did not know or with the exercise of reasonable diligence could not have known prior to two years from the date of the filing of this Complaint the facts establishing the elements of the various causes of action.

113.    Plaintiffs further invoke the "doctrine of fraudulent concealment" as an equitable doctrine that provides an affirmative defense to the plea in bar of limitations. In support thereof,

Plaintiffs allege that: a) Defendants had actual knowledge of the wrongful conduct set forth herein; and b) Defendants intentionally took actions to conceal the facts necessary for Plaintiffs to know of their claims. *Sky Station Holdings I, LP v. Fid. Nat'l Title Ins. Co.*, NO. 03-18-00231-CV1, (Tx. App. – Austin, August 13, 2019). Such concealment began prior to October 7, 2016 and has continued through the present. The acts of concealment include but are not limited to failure to make full disclosure of conflicts and the implication, nature and adverse consequences of such conflicts and the self-dealing of Defendants in violation of TDRPC 1.06 and 1.08. Further acts of concealment, in violation of TDRPC 1.15(d), included Defendants' failure to provide to Plaintiffs (despite repeated demands) full and complete files and other documentation within its possession.

## DAMAGES AND PRAYER FOR RELIEF

114.     Plaintiffs, on behalf of the Ward and Sycamore entities, are entitled to a minimum of Fifteen Million Dollars ($15,000,000.00) in actual damages due to the actions of Defendants in connection with the Weston Ranch transactions and Twelve Million Four Hundred Eighty One Hundred Ninety-Two Dollars ($12,480,192.00) in actual damages due to Larry's conservator being required to sell the property at a short sale for Ten Million Fifty Seven Thousand Eight Hundred Eighty Eight Dollars ($10,057,808.00) versus the Twenty Two Million Five Hundred Thirty Eight Thousand Dollars ($22,538,000.00) Ranch Water and Minerals had agreed to pay and which was the minimum market value expressed by Defendants.[5]

115.     Defendants' negligent and grossly negligent actions and breaches of fiduciary duties entitle Plaintiffs, on behalf of the Ward and his Sycamore entities, to punitive damages in excess of the statutory cap in an amount to be determined by the Court.

116.     Plaintiffs further request a judgment declaring null and void the provisions of the

---

[5] In 2011 Larry received an offer to purchase Weston Ranch for over $27 million.

Weston Ranch Agreement, Article 4, sections 4.10 and 4.11, relative to waiver of a jury trial and mediation as a prerequisite to filing a lawsuit; and complete restitution for all attorney fees, "commissions", or any other monies paid to Petry or LB by or on behalf of Plaintiffs in connection with any of the Weston Ranch transactions.

117.   Plaintiffs demand restitution and disgorgement of fees and commissions paid to Petry and/or LB for fees and "commissions" related to the Tyra ranch property.

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against Defendants, jointly and severally, in favor of Plaintiffs for the following:

(a)  Actual damages in excess of the amount of Twenty-Seven Million Four Hundred Eighty-One Thousand Ninety-Two Dollars ($27,480,192.00);

(b)  Punitive and/or exemplary damages in excess of the statutory cap in an amount to be determined by the Court;

(c)  Attorney's fees and expenses;

(d)  Prejudgment interest;

(e)  Forfeiture and disgorgement and/or restitution of all attorney fees and other fees paid by the Plaintiffs to Defendants from the beginning of the attorney client relationship until present as allowed by law under these circumstances and facts; and

(f)  Such further and other legal and equitable relief as the Court may deem just and necessary under the circumstances.

Dated: March 19, 2021.

Respectfully submitted,

CATHERINE H. McMAHAN,
CONSERVATOR OF LAWRENCE
G. "LARRY" HANCOCK and H. Sycamore
Creek L. P., and H. Sycamore Creek Ranch
Management GP, LLC
PLAINTIFFS


BY: */s/ Shane Langston*
    Shane Langston, Attorney for Plaintiffs
    Texas Bar No. 24101017
    LANGSTON & LANGSTON, PLLC
    412 Mesa Ranch Ct.
    Southlake, TX 76092
    Ph: 601-969-1356
    Cell: 601-214-0025
    Fax: 601-968-3866


OF COUNSEL:

C. JUSTIN BROOME
Texas Bar No. 24117555
LANGSTON & LANGSTON, PLLC
416 East Amite St.
Jackson, Mississippi 39201
Tel. (601) 969-1356
Fax. (601) 968-3866

## <u>CERTIFICATE OF SERVICE</u>

I, Shane F. Langston, attorney for the Plaintiffs do hereby certify that I have this day mailed via electronic mail (e-mail) a true and correct copy of the above and foregoing to all attorneys of record.

So certified, this the 19th day of March, 2021.

*/s/ Shane Langston*
SHANE F. LANGSTON
